**SCHOLASTIC INC. and Scholastic Productions, Inc., Plaintiffs,**

v.

**Robert HARRIS and Harris Entertainment, Inc., Defendants.**

**Nos. 95 Civ. 176(AKH), 95 Civ. 989(AKH).**

United States District Court, S.D. New York.

Dec. 29, 1999.

Martin Garbus, Frankfurt, Garbus, Klein, etc., New York City, for plaintiffs.

Richard C. Yeskoo, Farbricant & Yeskoo, New York City, for defendants.

### AMENDED OPINION AND ORDER

HELLERSTEIN, District Judge.

This case involves a joint venture formed by a publisher of children's books and its subsidiary, plaintiffs Scholastic Inc. ("Scholastic") and Scholastic Productions Inc. ("SPI") (collectively, the "Plaintiffs"), respectively, and a former movie studio executive, Defendant Robert Harris, and his production company, Defendant Harris Entertainment, Inc. ("HEI"), to create a motion picture production company to produce full-length feature films. Scholastic and SPI were to provide the capital, and Harris and HEI, their knowledge and skill, in acquiring, developing and producing motion pictures and other forms of entertainment. Pursuant to an agreement (the "Agreement") signed by SPI, Harris and HEI on October 12, 1990, Harris claims that he is entitled to 100,000 stock appreciation rights (the "SARs") in Scholastic, to be issued at designated intervals at $18 per share.

Plaintiffs, suing for a declaratory judgment, allege that they owe no SARs because the Agreement was not complete and unambiguous, because the SARs were not earned and did not vest and because Plaintiffs terminated the partnership (and,

therefore, their obligations) before such vesting. After extensive discovery, both sides moved for summary judgment. Plaintiffs moved for partial summary judgment on their First Claim for Relief, seeking a declaratory judgment that Harris is not entitled to the SARs. Defendants Harris and HEI moved for summary judgment dismissing Plaintiffs' complaint, and for judgment in their favor on their First Counterclaim, arguing that Scholastic and SPI breached the agreement by refusing to grant Harris the SARs.

I hold that the Agreement is complete and unambiguous, and that Harris did not breach the terms and conditions of that contract, and, consequently, that Harris is entitled to the SARs. Accordingly, I deny Plaintiffs' motion for partial summary judgment, and I grant Defendants' motion for summary judgment dismissing the complaint and granting judgment on Defendants' First Counterclaim.[1]

## STATEMENT OF FACTS

### A. The Parties

Defendant Robert Harris is a citizen of the State of Connecticut and the President and CEO of HEI, a California corporation. (Defendants' Am. Statement of Undisputed Facts Pursuant to Rule 56.1 ("Harris 56.1"), at ¶¶ 1,2). Prior to his involvement with the Defendants, Harris was the President of Universal Television at MCA, Inc./Universal and the President of Imagine Films, and had more than 25 years experience in the entertainment industry. (Harris Aff. at ¶ 5). Harris & Company ("Harris & Co.") is a partnership whose offices are located in Los Angeles, California. SPI and HEI are the two 50% owners of Harris & Co.

Scholastic, Inc. ("Scholastic") is a corporation organized under the laws of the State of New York whose stock is publicly traded on NASDAQ. Scholastic, Inc. ("SPI"), also a New York corporation, is a wholly-owned subsidiary of Scholastic.

The Court has diversity jurisdiction over the parties. 28 U.S.C. § 1332.

### B. The October 12, 1990 Agreement

In early 1990, SPI and Scholastic commenced negotiations with Harris and HEI to develop a motion picture production company. (Plaintiffs Scholastic and SPI's Statement of Undisputed Facts ("Scholastic 56.1"), at ¶ 1). In addition to having a stake in the produced films, Scholastic hoped to reap synergies from the motion picture production company, like books, licenses, and other ancillary products created from successful motion pictures. (Scholastic 56.1, at ¶ 2). During 1990, Harris & Co. provided Scholastic and SPI with a seven-year business plan, outlining the proposed lines of business for the venture, as well as anticipated revenues and expenditures. (Harris Aff., at Ex.6).

On October 12, 1990, SPI, agreed with HEI and Harris to a written joint venture agreement (the "Agreement") for the development and production of theatrical motion pictures and television programs. (Harris 56.1, at ¶ 6). SPI agreed to provide an initial $2,000,000 on a non-recourse basis for HEI's "development costs as requested by HEI," and approximately $116,000 per month for a 12 or 24 month period, according to the options set out in the Agreement, from the initial development funding date (the "IDFD") (the date the $2,000,000 was contributed) until:

(a) 24 months following the IDFD or (b) 12 months from the date SPI makes available the Development Loans to HEI pursuant to this paragraph as production costs and overhead to permit HEI to develop properties and provide services for such joint venture.

(Agreement, at § 1(b)). The Agreement thus provided that SPI was to contribute $2,000,000 initially, at HEI's request for HEI's "development costs," and later, at SPI's option, another $4,000,000 for "Development Loans" to HEI. In addition,

1. Defendants' Second Counterclaim for a finder's fee was withdrawn.

SPI undertook to pay HEI's overhead costs, that is, salaries to and expenses of, officers and employees of HEI, including salaries to and expenses of Plaintiff Harris, at the rate of $116,000 per month for defined periods of time, for either a one-year or two-year period, depending on the amount and extent of developmental funding that SPI agreed to provide.

Under the terms of the Agreement, SPI and HEI agreed to "jointly and equally own all motion picture and television properties developed with the first $2,000,000 of SPI's development funds." SPI was also given an option to acquire a 50% equity stake in HEI ("SPI's Equity Election"). (*Id.*). SPI also had the right to terminate funding on a certain date and retain its Equity Election, but for only a 25% equity state in HEI. (*Id.*). Thus, the Agreement provided:

> At any time up to the end of fifteen months following the IDFD, SPI shall have the right, at its sole discretion, to give written notice to HEI terminating SPI's continuing development funding obligations beyond the initial $2,000,000 set forth above ("SPI's Termination Right"). If SPI gives such notice, SI (sic) shall thereafter have the right at any time to exercise SPI's Equity Election and in such event SPI shall only be entitled to acquire 25% of the equity of HEI.

(*Id.*). If SPI chose not to exercise its Termination Right before the date, 15 months after the IDFD, SPI was obligated to provide, as stated above, an additional $4,000,-000.00 in funding, as "Development Loans." (*Id.*)[2].

According to the Agreement, HEI was to be run by Harris as the CEO and chairman of the board, with an executive from Scholastic to serve as the vice-chairman of its board of directors. (Agreement, at § 2). Harris was given "complete authority and control over all creative and business decisions of HEI," except that certain major transactions, as defined by the Agreement, would require the approval of SPI. (*Id.*). Harris was to enter into an employment agreement with HEI providing for Harris' exclusive services (except on projects he was working on with Imagine Studios) for a period of three years from the IDFD, provided that if SPI exercised its Termination Right, as described above, Harris had the right to terminate his exclusive employment arrangement with HEI. (*Id.*). In that event, Harris could continue his employment on a basis non-exclusive to HEI without any reduction in his salary. (*Id.*)

With respect to the projected corporate activities of HEI, the Agreement provided that the joint venture would be primarily focused on the "development, packaging, production and distribution of theatrical feature films, ('A' titles), while also involved "on a material level" in television development and production." (Agreement, at § 3). In aspirational language, the Agreement provided that:

> HEI expects to develop at least five to ten new feature film projects each year and to have at least one film go into production during year two followed by one to two films in production in year three. Thereafter, it is HEI's goal to be in a position to have two or three motion pictures commence production each year.

(*Id.*). Harris agreed that a minimum of "approximately 50% of HEI's theatrical motion picture development will involve seeking and developing projects ('Scholastic-franchise' projects) which complement or are suitable for exploitation by Scholastic's publishing and other entertainment-related activities." (*Id.*). The Agreement provided also that for "approximately 20% of [Harris'] work time, he will be available to Scholastic and SPI for consultation and

---

**2.** A series of amendments changed the applicable date before which SPI could exercise its

Termination Right. *See infra* Section C.

meetings in accordance with a schedule mutually approved by HEI and SPI.... (*Id.*). Nothing in the Agreement, however, provided for an objective measurement of the quality of Harris' services or a definite quantification of his output.

The parties agreed that Harris' compensation would be $500,000 in annual salary, plus a percentage of the production and overhead fees, bonuses on licensing and royalties, and other ancillary rights, (Agreement, at § 4) and, the issue of this lawsuit, 100,000 SARs.

> 100,000 stock appreciation rights to be issued at $18 per share and which shall vest one-third at the conclusion of the fourth year of HEI's operations, one-third at the conclusion of the fifth year of HEI's operations and one-third at the conclusion of the sixth year of HEI's operations.[3]

Scholastic and SPI were granted the "first opportunity" to license any "print publishing, merchandising and direct mail home video distribution rights to HEI projects," "on equitable terms," and without being subjected to "a competitive bidding situation for such rights." (Agreement, at § 5).

The Agreement contained a merger and integration clause, providing that it was the "entire agreement" between the parties (Agreement, at § 8j). The clause made reference to the parties' intention to "enter into a long form agreement setting forth the terms hereof and other terms and conditions customary in the motion picture negotiations," but provided that until such long form agreement was negotiated and executed, "this agreement"— the one that the parties signed—"shall remain a complete and mutually binding agreement." (*Id.*).

8. *Miscellaneous.* This agreement constitutes the entire agreement between HEI and SPI. It is further intended by the parties that they shall enter into a long form agreement setting forth the terms hereof and other terms and conditions customary in the motion picture industry (which shall be subject to good faith negotiations), but until such long form agreement is executed, this agreement shall remain a complete and mutually binding agreement ...

(Agreement, at § 8). The Agreement was executed by HEI, SPI and Harris.

## C. After the Execution of the Agreement

Despite their expressed intention to negotiate a "long form agreement," and the exchange of written drafts for such an agreement, the parties never came to another meeting of minds. (Scholastic 56.1, at ¶ 13). Instead, they agreed to twenty-one written amendments to the Agreement, confirming and implementing the October 12, 1990 agreement.[4] The amendment executed on August 28, 1991, for example, explicitly confirmed the joint venture between SPI and HEI, and provided that they would do business as a partnership, Harris & Co. (Scholastic 56.1, at ¶ 26). Other amendments changed the date upon which SPI had to exercise its Termination Right (the First Amendment) and modified various funding dates and modified the amounts of funding. (Harris Aff. at Ex. 4). Another Amendment gave Harris discretion to utilize the funds contributed to the Joint Venture by Scholastic. Significantly, the Amendments referred specifically to the "[A]greement" between the parties, i.e., the agreement executed on October 12, 1990. (*See,* Harris Aff. at Ex. 4). Thus, Scholastic's con-

---

3. That is, on December 1, 1994, 1995 and 1996, respectively.

4. It appears that the first two amendments were not officially numbered. The parties started to number the amendments upon execution of the third amendment, and referred to that as the First Amendment. The Twenty First Amendment, which was in actuality the twenty third amendment to the Agreement, was the last amendment to the Agreement. The amendments were executed between February 18, 1991 and May 21, 1993.

tentions in this lawsuit are contradicted by its contemporaneous contract negotiations with Harris during the two-and-a-half-year period of their relationship, from October 1990 through May 1993.

With respect to the funding of the Joint Venture, on December 1, 1990, SPI contributed the $2,000,000.00 initial development funding as required by section 1(b) of the Agreement, and that became the Initial Development Funding Date ("IDFD"). (Harris 56.1, at ¶ 9). The funds were used to commission approximately 17 scripts (Harris 56.1, at ¶ 13), implementing the agreement of the parties.

The parties heatedly dispute the successes and failures of the Joint Venture, and have expressed themselves in voluminous and vituperative submissions. Harris points to numerous projects and scripts and the development of films for the Joint Venture, such as "Indian in the Cupboard," "The Babysitter's Club," a number of pay cable films, and executions of Joint Ventures with Tri–Star Pictures, Fox Studios and other movie studios. Plaintiffs dispute Harris' claim to successes and accomplishments. The dispute, it seems to me, is not relevant. The contract required devotion of time and reasonable effort. It did not make commercial success of the efforts a condition of payment to Harris.

### D. Scholastic and SPI Terminate the Funding of Harris & Co.

Disappointed with the results of the Joint Venture, in May 1993, SPI exercised the right provided by the contract to cease further funding of the Joint Venture, and to have its interest in Harris & Co. reduced to 25%. Under the contract, Harris was excused from having to provide his services exclusively to the Joint Venture. (Scholastic 56.1 at ¶ 17). By that point, Scholastic had provided approximately $6.7 million to the Joint Venture. (Harris 56.1 at ¶ 28). Thus, Scholastic terminated further funding, stopped acquiring projects that Harris offered to Scholastic and SPI,

and advised Harris that it would not renew the lease for the Joint Venture's offices. (Scholastic 56.1, at ¶¶ 23–25). Harris vacated the offices, and sold some of the furniture back to the Plaintiffs. Pursuant to the Agreement, Harris continued to work for the Joint Venture, but did not have to do so exclusively. (See, Harris Aff., Ex. 4, at Twenty First Amendment).

In late 1993, Harris reminded Scholastic that one-third of the SARs promised to him by the Agreement would become due at the conclusion of the fourth year of HEI's operations, in December 1994. Scholastic and SPI, by their attorney's letter of November 11, 1993, rejected the demand:

> I do not intend to engage in a lengthy refutation of your arguments that [Harris] is entitled to any stock appreciation rights ("SAR").... As I have stated to you on several prior occasions, it is Scholastic's position that it has no obligation to Robert concerning the SARs.

(Scholastic 56.1, at ¶ 22). On January 11, 1995, Scholastic and SPI, anticipating a suit by Harris to enforce his entitlement to SARs under the October 12, 1990 agreement, filed this declaratory judgment lawsuit seeking to declare that entitlement invalid.

### E. The Claims of the Parties

Plaintiffs' Scholastic's and SPI's Amended Complaint (the "First Amended Complaint"), consolidating two separate actions, alleges nine claims for relief:

1. A declaratory judgment that Harris is not entitled to the Stock Appreciation Rights ("SARs") (First Am.Compl., at ¶¶ 40–48);

2. A declaratory judgment that Harris and HEI breached the terms of the Agreement because they "fail[ed] to accomplish, and fail[ed] to make a good-faith effort to accomplish" certain objectives.[5] (Id., at ¶¶ 49–53);

---

5. Plaintiffs' specific allegations charged de-    fendants with failing to:

3–5. A declaratory judgment that Harris and HEI fraudulently induced the Plaintiffs to enter into the Agreement; that Harris and HEI conspired to fraudulently induce the Plaintiffs to enter into the Agreement; and that Harris and HEI negligently misrepresented to Plaintiffs certain material facts in order to induce the Plaintiffs to enter into the Agreement. (*Id.* at ¶¶ 54–61, ¶¶ 62–68, ¶¶ 69–76);

6. A declaratory judgment that Harris and HEI breached their fiduciary duties to Scholastic and SPI. (*Id.* at ¶¶ 77–80);

7. An accounting because Harris and HEI unjustly enriched themselves by misusing for personal benefit the funds provided by Scholastic under the terms of the Agreement. (*Id.* at ¶¶ 81–83);

8. Damages because they converted such funds (*Id.* at ¶¶ 84–86); and

9. An accounting of all funds improperly retained by Defendants.[6]

Defendants Harris and HEI denied liability and filed two counterclaims alleging that Plaintiffs breached the Agreement by not granting to Harris the SARs when due according to the terms of the Agreement, and that Plaintiffs reneged upon an agreement to pay Harris a finder's fee for the purchase of a film library which Harris claims he steered to be Plaintiffs.[7]

Scholastic's and SPI's motion for partial summary judgment seeks a declaratory judgment that Harris is not entitled to the SARs pursuant to the Agreement. Harris' and HEI's motion for partial summary judgment seeks the dismissal of each of Plaintiffs' Nine Claims for Relief, and for judgment on its first counterclaim. Oral argument was held on the motions on July 27, 1999 and continued on September 1, 1999. I now deny Plaintiffs' motion for summary judgment and grant Defendant's motion for summary judgment.

## DISCUSSION

### A. *The Law Concerning Summary Judgment*

The standard for granting summary judgment is well established. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Celotex"). Summary judgment may be granted if the pleadings and written discovery,

(a) develop at least five to ten new feature film projects each year and have at least one film go into production during the second year of HEI's operations followed by one to two films in production in the third year of HEI's operations;
(b) be in a position to develop at least six to fifteen new projects and have two or three motion pictures commence production each year;
(c) devote a meaningful amount of HEI's resources to the development of children's, young-adult and family films;
(d) devote a minimum of approximately 50% of HEI's theatrical motion picture development activities to seeking and developing projects which would complement or would be suitable for exploitation by plaintiffs' publishing and other entertainment-related activities;
(e) be available 20% of Harris' work time to plaintiffs for consultation and meetings concerning plaintiffs' television and other businesses;
(f) increase plaintiffs' television operations and publishing, home video and book club businesses to reduce plaintiffs' risk in connection with the Agreement; and
(g) secure commitments for the production of certain theatrical motion pictures based upon scripts commissioned or acquired by Harris and HEI or otherwise achieve success in connection with the [Partnership]. (First Am. Compl., at ¶ 51). The text of the Agreement does not support these allegations. See discussion, *infra.*

6. Plaintiffs seek damages of $6.8 million, plus punitive damages, on their nine claims.

7. By Stipulation and Order of April 1, 1997, the parties agreed that the defendants' counterclaims are those asserted in the First and Second Counterclaims set forth in Defendants' answer and Counterclaim of March 17, 1995. Defendants' Third, Fifth and Sixth counterclaims were dismissed.

together with the affidavits, show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (1999); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994) (*"Gallo"*). The trial court's task at the summary judgment motion stage is to discern if there are genuine issues of material fact to be tried, not to deciding them; its duty is "issue-finding," it does not extend to "issue-resolution." *Gallo*, 22 F.3d at 1224.

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*"Matsushita"*). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e) (1999). The nonmoving party must raise more than just a "metaphysical doubt" as to the material facts. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202. If there is an absence of sufficient proof as to any essential element on which the opponent of summary judgment has the burden of proof, any factual dispute with respect to other elements becomes immaterial and cannot defeat the motion. *Gottlieb v. Co. of Orange*, 84 F.3d 511, 519 (2d Cir.1996) (*"Gottlieb"*). Speculative and conclusory allegations by the non-movant are insufficient to prevent a summary judgment motion from being granted. *Allen v. Coughlin*, 64 F.3d 77, 80 (2d Cir.1995) (*"Allen"*).

**B.** ***Scholastic and SPI's First and Second Claims for Relief, and Harris and HEI's First Counterclaim for Relief: Entitlement to the SARs***

Plaintiffs argue that Harris is not entitled to enforce the SARs because: (a) the Agreement executed by the parties on October 12, 1990 was not sufficiently detailed to constitute an enforceable agreement with respect to the SARs, and the parties failed to agree to a more detailed agreement; (b) Scholastic, Inc., the issuer of the SARs, cannot be bound because it was not a signatory to the Agreement and the Statute of Frauds bars proof against it; and (c) the filing of suit by plaintiffs constituted a dissolution of the partnership prior to the vesting dates of the SARs. Plaintiffs' arguments are without merit.

**1.** ***The October 12, 1990 Agreement is Sufficient and Binding.***

Under Section 8 of the Agreement, Scholastic and SPI agreed that their Agreement "constitutes the entire agreement between HEI and SPI." They recognized that they were negotiating, that their agreement of October 12, 1990 "shall remain a complete and mutually binding agreement," and that this was so even if their negotiations were to fail.

■ In determining whether a contract exists, the inquiry centers upon the parties' intent to be bound, i.e., whether there was a "meeting of the minds regarding the material terms of the transaction." *Henri Assocs. v. Saxony Carpet Co., Inc.*, 249 A.D.2d 63, 671 N.Y.S.2d 46, 49 (1st Dep't 1998); *See also Helmsley–Spear, Inc. v. New York Blood Center, Inc.*, 257 A.D.2d 64, 687 N.Y.S.2d 353 (1st Dep't 1999) (*"Helmsley–Spear"*). The Court decides if the terms of the agreement are sufficiently described. *Helmsley–Spear*, 687 N.Y.S.2d at 356. I hold that they are; the parties' intent to be bound by the terms of the Agreement are shown by the express terms themselves. The parties recognized the possibility that negotiations to form a long form agreement might fail, and provided for that contingency by providing that their October 12, 1990 agreement would continue to be binding.

The parties' ultimate goal to enter into a long-form agreement does not change the analysis. Since "[t]he easiest way for a party to make clear an intention not to be bound is to say so," the absence of such an intention or indeed the presence of language articulating an intent to be bound is of great relevance. Farnsworth on Contracts § 3.7 (2d ed.1998). Language stating that a contract constitutes "an entire agreement" (Agreement ¶ 8) strongly suggests that the parties intended to form such a binding contract. Although the parties also agreed to negotiate in good faith to create the details to facilitate the implementation of the agreed upon terms, the inability to agree further does not vitiate that which was already agreed. *Cauff, Lippman & Co. v. Apogee Finance Group, Inc.*, 807 F.Supp. 1007, 1021 (S.D.N.Y. 1992). *See also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989) (language of contract is most important factor in determining if preliminary agreement is binding); *George Backer Management, Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 213, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978) ("[E]vidence of a very high order is required to overcome the heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties."); Farnsworth at § 3.8(a) (if no agreement is reached on open terms so that there is not ultimate agreement, *"the parties are bound by their original agreement....* )." (emphasis in the original).

It is fundamental that a contract will be found to be binding by looking at the "objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Mencher v. Weiss*, 306 N.Y. 1, 114 N.E.2d 177; *Homan v. Earle*, 53 N.Y. 267, 272. I find, by looking at the expressed and unambiguous terms of the October 12, 1990 agreement, that the parties intended to be bound by their Agreement including Section 4 of the Agreement, providing in unambiguous term that Harris shall be entitled to the SARs on the Fourth, Fifth and Sixth Year anniversary dates of "HEI's operations," (Agreement, at ¶ 4).

### 2. *The Statute of Frauds is not a Valid Defense.*

Plaintiffs' reliance upon the Statute of Frauds as an excuse to discharge Scholastic is misplaced. Despite the fact that Scholastic did not execute the contract, it admitted in its pleading that both it and SPI had agreed to grant Harris 100,000 SARs in Scholastic. Under New York General Obligations Law § 5–701(b)(3)(c), notwithstanding the provisions of the Statute of Frauds, there will be sufficient evidence that a contract has been made if, among other things:

> (c) The party against whom enforcement is sought admits in its pleading, testimony or otherwise in court that a contract was made; ...

N.Y.Gen.Oblig.Law § 5–701(b)(3)(c) (McKinney's 1999). And Scholastic and SPI admitted Scholastic's agreement to grant 100,000 SARs to Harris in their pleadings. Thus, Plaintiffs' alleged in the complaint:

> 22. Pursuant to the Agreement, Scholastic and Scholastic Productions also agreed to grant Harris 100,000 stock appreciation rights in Scholastic which would vest, under certain conditions precedent, one-third at the conclusion of the fourth year of HEI's operations as set forth in paragraph 3 of the Agreement (i.e.1994), one-third at the conclusion of the fifth year of HEI's operations (i.e.1995), and one-third at the conclusion of the sixth year of HEI's operations (i.e.1996).

(First Am.Compl. at ¶ 22). Such an admission not only eliminates the applicability of the Statute of Frauds, but also qualifies as a conclusive judicial admission that Scholastic agreed to grant Harris 100,000 SARs. *See, Western World Insurance Company v. Stack Oil, Inc.*, 922 F.2d 118, 121–22 (2d Cir.1990) (formal admission in parties' amended answer constitutes judi-

cial admission that insurance policy included an endorsement); *PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 123 (2d. Cir.1984).

### 3. *A Breach of Contract by Defendants has not been Shown.*

■ Scholastic and SPI argue that Harris breached the explicit terms of the Agreement, entitling Scholastic and SPI to terminate the partnership. The contention of breach is without merit. First, the allegations in the First Amended Complaint of seven different breaches, summarized at note 4, *supra,* are not grounded in any provision of the Agreement. The allegations of breach reflect, not what was in the Agreement but, rather, that which Plaintiffs wish the Agreement had provided. However, since Section 8 of the Agreement provides that it "constitutes the entire agreement" between the parties, there is no possibility of different oral agreements. *Henri Assocs. v. Saxony Carpet Co., Inc.,* 249 A.D.2d 63, 671 N.Y.S.2d 46, 49 (1st Dep't 1998). The claims of oral agreements described in Plaintiffs' lengthy affidavits are excluded under the parole evidence rule, and cannot raise a triable issue of fact. *See, Hunt Ltd. v. Lifschultz Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989); *Armour & Co. v. Celic,* 294 F.2d 432, 438 (2d Cir.1961).

■ At oral argument, Plaintiffs narrowed their claim of breach to three: HEI failed to devote 50% of its theatrical motion picture development activities on projects for SPI; Harris failed to devote 20% of his time developing projects for SPI; and Harris and HEI failed to provide Scholastic and SPI "first opportunity to license available print publishing, merchandising, home video, [and] home distribution rights" for Joint Venture Projects. There is not, however, a single contemporaneous document in the record that notified Defendants of any such claim of breach, and certainly no notice calling upon plaintiff to correct or cure an alleged breach. Plaintiffs' allegations and claims vary materially from the terms and conditions stated in the Agreement. Counsel for Plaintiffs admitted this fatal absence in oral argument:

> THE COURT: Is there a letter or other notice in the exhibits which gives Harris notice that he is in breach and gives him notice to cure?
>
> MR. GARBUS: There are dialog[ues]. I don't think there is a letter.

(Oral Arg.Tr., July 27, 1999, at pp. 17–18).

It was not until over ten months after the parties stopped performing under the contract that Plaintiffs first claimed that Defendants committed a breach. Plaintiffs have failed to set out any facts demonstrating that Defendants committed a breach. *See International Paper Co. v. Margrove, Inc.,* 75 Misc.2d 763, 348 N.Y.S.2d 916 (1973) (five months following final delivery, acceptance of goods and buyer's attempt to set payment schedule, was not reasonable time within which to notify seller of breach).

### 4. *Plaintiffs' Filing of a Lawsuit Did Not Relieve it of Obligations Owed to Plaintiffs.*

■ I hold, also, that the bringing of suit by Plaintiffs did not abrogate Plaintiffs' obligations to Defendants. It would be a strange rule of law if a plaintiff, simply by filing suit, could despoil a contract promisee of that which he fairly had the right to receive. Furthermore, even if the filing of suit effected a dissolution of the partnership, a dissolution alone does not terminate the rights and obligations of the partners. N.Y. Partnership Law § 61 (McKinney's 1999). Dissolution terminates only a partner's authority to act for the partnership except to the extent necessary to wind up partnership affairs (*see,* N.Y. Partnership Law § 64 (McKinney's 1999)), but any pre-dissolution liabilities or obligations of the partners continue. *Keogh v. Breed, Abbott & Morgan,* 224 A.D.2d 180, 181, 637 N.Y.S.2d 124 (1st Dep't 1996); *Pastor v. State Tax Commis-*

*sion,* 115 A.D.2d 144, 146, 495 N.Y.S.2d 515, 517 (3d Dep't 1985).

Here, Plaintiffs never notified Harris of the termination of the Joint Venture. There is no document in the record that expresses such a termination. In its original complaint, Plaintiffs alleged only that "the [Joint Venture] is not operating as contemplated by the paragraph 3 of [the] Agreement, and has not operated since at least March 1, 1994;" but there is no mention of any document evidencing that Plaintiffs notified either Harris or HEI of Plaintiffs claim that the Joint Venture was terminated. (Scholastic 56.1, at ¶ 34).[8] The filing of the lawsuit in a partnership at will could, of course, constitute a notification by Plaintiffs that they wished to dissolve the partnership and seek an accounting. *See* N.Y. Partnership Law § 68 (McKinney's 1999); *Yorkes v. Ross,* 142 A.D.2d 642, 530 N.Y.S.2d 590 (2d Dep't 1988) ("Any partner who has not wrongfully dissolved partnership has the right to wind up partnership affairs "provided ... that any partner ... upon cause shown may obtain winding up by the court." "). But such notice by Plaintiffs does not thereby effect a quitclaim of obligations by Plaintiffs to Defendants. According to the terms of the Agreement, the SARs that SPI granted to Harris vested "one third at the conclusion of the fourth year of HEI's operations, one-third at the conclusion of the fifth year of HEI's operations, and one third at the conclusion of the sixth year of HEI's operations. (Agreement, at ¶ 4).

Thus, I hold that Defendant Harris is entitled to recover from Plaintiffs the reasonable value of 100,000 stock appreciation rights in Scholastic, Inc., as of December 1994, December 1995 and December 1996,

respectively. The undisputed record shows that the publicly-traded shares of Scholastic, Inc. had values as of those dates of $47.00 per share, $69.25 per share, and $74.50 per share, respectively. (Pl. Am.Resp. to Def. First Notice to Admit. ¶ 5). Consequently, the respective per-share value of the SARs, based on the issue price provided by the Agreement of $18 per share, was: $29.00, $51.25 and $56.50, respectively. Multiplying the respective differences each by 33,333.33 shares, the resulting values are $966.666.57, $1,708,333.16 and $1,883,-333.15. The total value that Harris is entitled to recover is $4,558,332.88, plus interest from the vesting dates and a reasonable grace period thereafter.[9]

## C. *Plaintiffs' Third, Fourth and Fifth Claims for Relief should be Dismissed*

### 1. *Plaintiffs' Third Claim for Relief Alleging Fraudulent Inducement.*

Plaintiffs' Third Claim for Relief alleges that Harris and HEI fraudulently induced both Scholastic and SPI to enter into the Agreement by making material misrepresentations with respect to how many projects HEI would develop, the amount of time and resources Harris would utilize for the development of "children's, young-adult and family films," and the amount of time Harris would devote to such endeavors. These are the identical duties which Harris and HEI are alleged to have breached with respect to the Agreement. (*Compare* First Am.Compl., at ¶ 51(a)–(g) (Breach of contract allegations), *with* ¶ 55(a)–(g) (fraudulent inducement claim)). Moreover, like their breach of contract

---

8. Indeed, even through 1997, three years after Plaintiffs sued, the Joint Venture continued reporting its operating losses to its partners. (Harris 56.1, at ¶¶ 7–8). Scholastic reported its share of Harris & Co.'s operating losses in its consolidated federal tax returns, thus realizing tax benefits. (Scholastic 56.1, at ¶ 19, Harris 56.1, at ¶ 8). Moreover, Scholastic continues to maintain an interest in partnership assets. (Harris 56.1, at ¶ 8).

9. Interest shall therefore be calculated from December 31, 1994, 1995 and 1996 respectively. In the context of the parties' relationships and the manner that terms of years were calculated from the Initial Funding Date, a 30 day period before interest begins to run is commercially reasonable.

claim, Scholastic and SPI allege that they have been damaged in the amount "estimated to be at least $6,800,000 plus interest and punitive damages in an indeterminate amount but no less than the sum of $10,000,000." (First Am.Compl., at ¶ 61).

The same allegations which serve as the basis of a breach of contract claim may not serve as the foundation of a fraudulent inducement claim. *See, Rolls–Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 123 (S.D.N.Y.1996) (mere promissory statement that a party will live up to his contractual obligations generally cannot be the basis of a fraud claim; allegations of breach of contract do nor give rise to a claim of fraud) (*"Rolls–Royce"*); *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986). Courts which have analyzed this issue have refused to permit a fraudulent inducement claim arising from a contractual relationship unless: (1) the claims are premised on a "separate duty outside the [contract]" or (2) the plaintiff seeks to recover "special damages proximately caused by the alleged false representations that are not recoverable under the current contract measure of damages." *Best Western Int'l, Inc. v. CSI International Corp.,* No. 94 Civ. 360, 1994 WL 465905, at *5 (S.D.N.Y. Aug. 23, 1994); *see also, Sudul v. Computer Outsourcing Servs.,* 868 F.Supp. 59, 62–63 (S.D.N.Y.1994).

Here, the identical allegations which serve as the basis for Scholastic and SPI's breach of contract claim serve as the basis for the fraudulent inducement claim. *Bell Sports, Inc. v. System Software Associates, Inc.,* 45 F.Supp.2d 220, 227 (E.D.N.Y.1999). The same damages are sought, and Scholastic and SPI do not claim special or distinct damages caused by the alleged fraudulent inducement. *Dornberger v. Metropolitan Life Ins. Co.,* 961 F.Supp. 506, 542 (S.D.N.Y.1997). Plaintiffs' Third Claim for Relief alleging

fraudulent inducement of contract is dismissed with prejudice.

### 2. *Plaintiffs' Fourth Claim for Relief Alleging Conspiracy to Defraud.*

Plaintiffs' Fourth Claim for Relief alleges that HEI and Harris conspired fraudulently to induce them to enter into the Agreement. (First Am. Compl., at ¶ 62–68). Under New York law, a claim for conspiracy to defraud cannot be maintained without demonstrating the underlying action of fraud. Since, I have dismissed with prejudice Plaintiffs' claim alleging fraudulent inducement, I am also dismissing with prejudice Plaintiffs' Fourth Claim for Relief alleging that HEI and Harris conspired to defraud Scholastic and SPI.

### 3. *Plaintiffs' Fifth Claim for Relief Alleging Negligent Misrepresentation.*

Plaintiffs' allegations with respect to its negligent misrepresentation are identical to its fraudulent inducement and conspiracy claims—indeed, the same seven allegations that served as the foundation for the breach of contract, fraudulent inducements and conspiracy claims are set forth as the basis for a claim of negligent misrepresentations. (*See* First Am. Compl., at ¶ 51(a)–(g) (Breach of Contract claim), at ¶ 55(a)–(g) (Fraudulent Inducement claim), at ¶ 64(a)–(g) (Conspiracy claim); at ¶ 70(a)–(g) (Negligent Misrepresentations)). Because this claim is based on the same deficient allegations supporting those claims for relief, Plaintiffs' Fifth Claim for Relief is also dismissed. *Rolls–Royce,* 929 F.Supp. at 124.

### D. *Plaintiffs' Sixth and Seventh Claims for Relief should be Dismissed*

Plaintiffs' Sixth Claim for Relief alleges that Harris breached his fiduciary duties to the Plaintiffs. The allegations are essentially the same as those alleged as the conduct which breached the Agree-

ment. Under New York law, the elements of a claim for breach of fiduciary duty are (1) breach of a duty owed to the Plaintiffs; (2) Defendants' knowing participation in the breach of fiduciary duty; (3) and damages suffered by the plaintiff which were proximately caused by the alleged breach. *See, e.g., Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 281 (2d Cir. 1992).

■ Plaintiffs fall to set forth any evidence that Harris breached any duty owed to them outside the contract. And since their allegations of breach of a fiduciary duty are identical to those supporting their claim for breach of contract, and I have held that neither Harris nor HEI breached the Agreement between the Plaintiffs and Harris and HEI, the allegations of breach of fiduciary obligation are without merit. *See, North Shore Bottling Co. v. C. Schmidt & Sons,* 22 N.Y.2d 171, 179, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968); *Layden v. Boccio,* 253 A.D.2d 540, 541, 686 N.Y.S.2d 763 (2d Dep't 1998) (*"Layden"*) ("Since the plaintiff is not alleging tort liability or a breach of a duty distinct from, or in addition to, the breach of contract," the claims alleging breach of fiduciary duty and unjust enrichment are dismissed.). For the same reasons, Plaintiffs' Seventh Claim for Relief alleging unjust enrichment must also be dismissed. *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388–89, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987); *Layden,* 253 A.D.2d at 541, 686 N.Y.S.2d 763. Consequently, Plaintiffs' Sixth and Seventh Claims for Relief, alleging breach of fiduciary duty and unjust enrichment, are dismissed with prejudice.

### E. *Plaintiffs' Eighth Claim for Relief alleging Conversion should be Dismissed*

Plaintiffs allege that money contributed by Scholastic and SPI was unlawfully converted by Harris and HEI.

■ Under New York law, the elements of conversion are: (1) that the plaintiff has a "right to possession" of the property converted; (2) the Defendant's possession of the payment was unauthorized; (3) the Defendant acted to exclude the rights of the lawful owner of the property; (4) the property or payment is "specifically identifiable;" and (5) the Defendant is obligated to return the payment. *Key Bank v. Grossi,* 227 A.D.2d 841, 642 N.Y.S.2d 403 (3rd Dep't 1996). Moreover, claims for conversion will be deemed redundant and dismissed when "damages are merely being sought for breach of contract." *Rolls–Royce,* 929 F.Supp. at 124; *Peters Griffin Woodward, Inc. v. WCSC, Inc.,* 88 A.D.2d 883, 884, 452 N.Y.S.2d 599, 600 (N.Y.A.D.1st Dept.1982).

■ In the instant action, Plaintiffs fail to set forth any facts demonstrating that either Harris or HEI was not authorized to use the capital contributions provided by Scholastic and SPI for the purpose of the Joint Venture. (Oral Arg.Tr., Sept. 1, 1999, at pp. 13–19). Indeed, under the terms of the Agreement, Scholastic and SPI were obligated to provide such contributions to HEI, and HEI was entitled to receive and use such money. There was no obligation on the part of HEI and Harris to return money to Plaintiffs, or to reimburse them for any losses. Plaintiffs have no legally sufficient claim for conversion. Consequently, Plaintiffs' Eighth Claim for Relief is dismissed with prejudice.

### F. *Plaintiffs' Ninth Claim for Relief Requesting an Accounting*

■ Plaintiffs base their claim for an accounting on their allegations of breach of contract and torts causing harm to Plaintiffs, and argue that precise amount of damage cannot be determined accurately. First Amended Compl. at ¶¶ 87–92. But, the inability to quantify damages does not give rise to an accounting. *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 49

(2d Cir.1996). Furthermore, Plaintiffs admit that Harris and HEI did no more than spend on partnership matters the money that plaintiffs provided pursuant to their contract obligations. (Oral Arg.Tr., Sept. 1, 1999, at pp. 13–19). That also is not a ground for an accounting. *See Leveraged Leasing,* 87 F.3d at 49 (determining that in case alleging breach of contract and conversion, "no useful purpose would be served" by adding an equitable accounting claim to claims for breach of contract and conversion).

I have found that neither Harris nor HEI breached any of the terms of the Agreement, and that neither Harris nor HEI committed any of the torts alleged by Plaintiffs, Plaintiffs' claim for an accounting is thus without basis. Thus, Plaintiffs Ninth Claim for Relief seeking an accounting is dismissed.

### CONCLUSION

For the reasons stated, I hold that neither Harris nor HEI breached the Agreement, and that Scholastic and SPI are obligated to grant Harris the SARs as of December 1994, 1995 and 1996 and, thus, Harris is entitled to judgment in the amount of $4,558,332.88 from the Plaintiffs, plus interest as noted in footnote 9. Harris and HEI are entitled to judgment against Scholastic and SPI on their First Counterclaim, and Plaintiffs' Complaint is dismissed with prejudice. The Clerk of the Court is directed to close this case.

SO ORDERED.