**SCHOLASTIC, INC. and Scholastic Productions, Inc., Plaintiffs–Appellants,**

v.

**Robert HARRIS and Harris Entertainment, Inc., Defendants–Appellees.**

**No. 00–7465.**

United States Court of Appeals, Second Circuit.

Argued Nov. 14, 2000.

Decided July 26, 2001.

---

Michael J. Chepiga, New York, NY, (Michael A. Berg, Simpson Thacher & Bartlett, New York, NY, of counsel), for Plaintiffs–Appellants.

Alfred R. Fabricant, New York, NY, (Ostrolenk, Faber, Gerb & Soffen, LLP,

New York, NY, of counsel), for Defendants–Appellees.

Before: CARDAMONE, CALABRESI, and KATZMANN, Circuit Judges.

CARDAMONE, Circuit Judge:

Plaintiffs, Scholastic, Inc. and its wholly-owned subsidiary, Scholastic Productions, Inc. (collectively Scholastic or appellant), appeal the December 29, 1999 order of the United States District Court for the Southern District of New York (Hellerstein, J.) that denied Scholastic's motion for summary judgment, but granted the cross-motion of defendants-appellees Robert Harris (Harris) and Harris Entertainment, Inc. (Harris Entertainment) for the same relief. Scholastic sought a declaration that Harris, its former partner in a joint venture formed to develop and produce motion pictures and television programs, was not entitled to certain stock appreciation rights (SARs) provided for in their joint venture agreement. Plaintiffs also sought a judicial accounting of the joint venture. Defendant Harris counterclaimed for breach of contract claiming that plaintiffs were obligated to him for the SARs. The district court granted Harris summary judgment on his breach of contract claim finding him entitled to the SARs, and denied plaintiffs' request for a declaratory judgment and for an accounting.

This appeal from the grant of summary judgment in defendants' favor plunges us into reviewing a contract dispute between the parties over the meaning of language used in the joint venture agreement. Although we think the contract ambiguous, it is not so vague as to make no pretense at meaning whatsoever. To the contrary, some of the key words are susceptible to different and distinct meanings in considerable tension with one another. Such circumstance raises questions of fact. For that reason, we cannot adopt the trial judge's view of what was meant, nor the divergent views of the parties, both of whom, like Humpty Dumpty, insist that the disputed words mean just what each of them chooses them to mean, neither more nor less. *See* Lewis Carroll, Through the Looking–Glass ch.6 at 106–09 (Schocken Books 1987) (1872). Thus, the resolution of this litigation must be made by a jury, which considering the disputed language in the light of extrinsic evidence, can get at the parties' intended meaning.

## BACKGROUND

Appellant Scholastic, Inc. is a well-known publisher of children's books and magazines, and Scholastic Productions, Inc. is its motion picture and television subsidiary. Appellee Robert Harris is a prominent movie and television executive, having served as president of Universal Television, MCA Television Group (MCA, Inc. is the parent of Universal) and Imagine Films. During his tenure at MCA/Universal, Harris supervised the development and production of several successful television programs, including such notables as "Murder, She Wrote," "Magnum, P.I.," "Miami Vice," and "Knight Rider."

In early 1990 Scholastic and Harris began negotiations to form a new production company which was to be financed by Scholastic and managed by Harris. Scholastic wanted to assume an active role in the production of family-oriented feature films and television programs. Along with its financial interest in the production company's projects, Scholastic sought to capitalize on any ancillary rights, such as books and merchandise. Harris was anxious to form his own independent production company and felt it critical that any new position provide him compensation comparable to the seven-figure annual income he was then receiving. In June 1990

prior to a formal agreement on the terms of collaboration, Scholastic advanced $464,350 for the initial overhead expenditures of the proposed production company.

### The Joint Venture Agreement

Four months later on October 12, 1990 the parties signed a joint venture agreement (Agreement) that set forth their obligations regarding the management, operation and funding of the production company. The Agreement was signed by a representative from Scholastic, and by Harris in his own capacity and on behalf of his preexisting personal company, Harris Entertainment.

Scholastic agreed to pay an initial $2 million for development costs plus $116,000 per month for the venture's overhead expenses commencing 12 months after the date on which the initial $2 million was allotted (funding date). Scholastic and Harris Entertainment would equally own all properties developed. Scholastic could terminate funding for up to 15 months after the funding date, in which case it would not provide future funds, but its equity interest in the venture would be reduced to 25 percent. If Scholastic did not exercise its termination right, it maintained its 50 percent interest in the joint venture and became obligated to pay an additional $4 million in development funds.

The Agreement further provided that Harris would be in charge of the venture's daily operations with authority over creative and business decisions. Agreement ¶ 2, at 5. The projected corporate activities of the joint venture included the development, production and distribution of feature films ("A" titles), and also involved television development and production. It was agreed that 50 percent of the motion picture developmental activities be "suitable for exploitation by Scholastic's publishing and other entertainment-related ac-

tivities." Agreement ¶ 3, at 6. Harris agreed to work exclusively on venture projects for a three-year period, unless Scholastic exercised its right to terminate funding, in which case he could become nonexclusive.

### Harris' Compensation Package

Harris' compensation was fixed at $500,000 annually "in each of HEI's first three years of operations," plus a share of the production fees on each project and a 15 percent bonus on revenues from licensing fees, royalties, and the like. Agreement ¶ 4, at 6–7. Further, of primary relevance to the instant dispute, the Agreement provided that Harris would receive stock appreciation rights in Scholastic stock:

> SI [Scholastic, Inc.] will grant to Robert Harris 100,000 stock appreciation rights to be issued at $18 per share and which shall vest one-third at the conclusion of the fourth year of HEI's operations, one-third at the conclusion of the fifth year of HEI's operations and one-third at the conclusion of the sixth year of HEI's operations.

Agreement ¶ 4, at 7. Stock appreciation rights are a form of executive compensation that give the holder the right to a cash payment or stock in an amount representing the difference between the market price and the fixed or strike price specified on the face of the SAR. *Searls v. Glasser*, 64 F.3d 1061, 1064–65 (7th Cir.1995).

According to Scholastic's expert, SARs are valuable because they allow the holder to reap gains on a share price without the risk of suffering a loss should the market price of the stock decline. In light of this, Scholastic alleges the SARs are almost always contingent upon certain performance conditions for the executive, and usually stipulate that the SARs only vest when the grantor has received a designat-

ed benefit. In this case, Scholastic contends the performance-related condition was that Harris must complete a stated minimum period of continuous service after the date on which the SARs were granted.

Although the Agreement envisioned a long form agreement fully setting forth the terms and conditions of the joint venture and the parties' reciprocal obligations, no such agreement was ever executed. Instead the parties added 21 written amendments to the Agreement. Each amendment supplemented the Agreement's terms but reaffirmed that, unless explicitly amended, the October 12, 1990 Agreement controlled.

### The Parties' Performance of the Agreement

Scholastic contributed the initial $2 million on December 1, 1990. As stipulated in the First Amendment, Scholastic's initial contribution established that date as the funding date, thus setting the vesting dates for the SARs as December 1 in the years 1994–95–96 (*i.e.* four, five and six years after the commencement of "HEI's operations").

The parties dispute the venture's relative success. Harris recognizes the venture never made a profit, but declares that since its inception he commissioned 17 scripts and developed over 30 projects. Some projects that Harris has developed are allegedly active to date. Scholastic insists that there is little to show from Harris' labor. It thinks the venture an utter failure, since none of the projects developed by Harris resulted in a theatrical release and only a minority of the films produced were suitable for Scholastic's target audience.

### The Alleged Termination of the Venture

Appellant contends that because of its losses, it terminated the joint venture and ended its business relationship with Harris. Although Scholastic did not produce a formal written notice of termination, it asserts that a series of events and conversations, beginning in 1992 and culminating with the commencement of this action in early 1995, evidences its intent that the venture be dissolved.

In 1992 Scholastic wrote off its investment in the joint venture for book purposes, but not tax purposes, and informed its outside auditors that it did not believe the collaboration would generate any revenues. A press release in June of that year explained that Scholastic would continue to pursue film production projects in active development, and it continued to fund the venture in hopes of eventually realizing a profit.

According to appellant, by the beginning of the next year, it wanted to end the relationship. In February 1993 the chairman of Scholastic allegedly met with Harris and informed him that the company would end funding and terminate the venture unless a successful project was produced in the near future. The following May the parties executed the Twenty–First, and final, amendment to the joint venture agreement. The Twenty–First Amendment terminated Scholastic's funding obligations, both for developmental loans and overhead but, contrary to the terms of the Agreement, vested Scholastic with a 50 percent equity interest in the joint venture.

While the amendment provided that Scholastic's funding obligations had ceased, it intimated that the joint venture as a business entity would nevertheless continue. Thus, paragraph 4 provided that all revenues received by the joint venture from outside sources were to be

used to fund the venture's overhead or developmental expenses, "until mutually agreed to the contrary by the parties." Moreover, the amendment provided that if Harris elected to execute his right to become non-exclusive because of the termination of funding, "he shall ... nevertheless continue to use his reasonable, good faith efforts to continue to develop and to attempt to arrange for the financing, production and distribution of those joint venture properties determined by him in good faith to have potential commercial value as motion picture properties."

Although Scholastic avers that at some point after the execution of the Twenty–First Amendment it informed its outside auditor that the venture was being terminated, counsel for Scholastic forwarded to Harris in September 1993 a draft "Restated and Amended Scholastic–HEI Joint Venture Agreement," which confirmed that the collaboration was ongoing, but made no provision for Harris' stock appreciation rights. This draft proposal precipitated contentious legal wrangling between the attorneys for the parties. Harris' attorney telephoned appellant's counsel to object to the removal of the SAR provision in the draft. Scholastic's attorney indicated in deposition testimony that he informed Harris' lawyer during this conversation that it was Scholastic's position that the joint venture was terminated: "I got on a telephone call ... and I tell [Harris' attorney] this is terminated.... [I]t's over.... That was the dialogue. I terminated it after my client asked me to confirm his termination. That's what happened." Frankfurt Tr. at 180–81. A second Scholastic attorney similarly testified that he informed counsel for Harris that the venture was terminated. Harris' attorney denies he was informed of the termination, asserting instead that Scholastic's counsel only stated that it was Scholastic's position that it

was not obligated under the SAR provision because its *funding* obligations had ceased.

Scholastic claims that by 1994 all semblance of an active collaboration between the parties had ceased: Scholastic was no longer funding the joint venture; Harris and representatives for Scholastic had little contact; the venture did not acquire new projects; Harris terminated much of his development staff; Scholastic did not renew the real estate lease for the office of the joint venture and Harris relocated to offices in Universal Studios (for which he was now developing television and film projects); and Scholastic canceled the key-man insurance policy it had procured on him.

Finally, Martin Keltz, as president of Scholastic Productions, Inc. allegedly reiterated to Harris, in response to a loan request, that the joint venture had been terminated. In a June 8, 1994 memorandum to file, Keltz purportedly memorialized the substance of this conversation:

> Separate from the personal embarrassment, there is no justifiable business reason since from our point of view the joint venture no longer exists.... [T]here is no ongoing business but rather the liquidating of the asset. Any new feature film opportunities will be exclusively owned and controlled by Harris and ours is a business association that has been terminated.

Harris challenges the authenticity of this memo, insinuating that the document was manufactured for litigation purposes and that the memo recounts a conversation that never took place.

### Proceedings Below

On January 11, 1995 Scholastic initiated the present suit in district court against Harris Entertainment and Harris. Among

Scholastic's nine claims for relief were allegations of breach of contract and fiduciary duty, fraudulent inducement, negligent misrepresentation, unjust enrichment, conspiracy to defraud, conversion, and a request for a declaratory judgment that Harris was not entitled to the SARs. Scholastic also sought an accounting of funds due under the Agreement that had allegedly been wrongfully withheld by Harris. The complaint described the status of the joint venture at the time the action was initiated as follows

> [A]lthough HEI still exists as a legal corporate entity, it is not operating as contemplated by [the Agreement] and has not so operated since at least March 1, 1994. HEI is not developing new properties, nor is there any expectation that HEI will commence production on film projects on behalf of the Joint Venture in the foreseeable future. All that remains of the Joint Venture is to liquidate its assets, consisting of the scripts which the parties have for several months unsuccessfully tried to do.

Compl. ¶ 39.[1] The defendants counterclaimed for breach of contract, contending that Scholastic was obligated under the Agreement to pay Harris the value of the SARs.

In January and July 1999 following extensive discovery, the parties cross-moved for summary judgment. In an amended opinion and order of December 29, 1999, the district court granted summary judgment on Harris' claim that Scholastic was obligated under the SAR provision of the Agreement and dismissed all of Scholastic's claims for relief. *Scholastic Inc. v. Harris,* 80 F.Supp.2d 139, 153 (S.D.N.Y. 1999). Judge Hellerstein, relying in part on the dearth of documentary evidence,

suggested that Scholastic did not notify Harris of the termination of the joint venture and that the filing of the lawsuit, by itself, did not effect a dissolution. *Id.* at 149–50. Accordingly, the SARs vested at the conclusion of the venture's fourth, fifth and sixth years of operations—*i.e.,* "as of December 1994, December 1995 and December 1996, respectively"—and Harris was thus entitled to be compensated for their reasonable value. *Id.* at 150.

In the district court's February 16, 2000 amended judgment appellant was found obligated to Harris in the amount of $6,121,988.20, the value of the SARs plus interest. Scholastic has appealed a portion of that judgment alleging the district court erred in granting summary judgment to Harris and denying declaratory relief to Scholastic with respect to Harris' asserted entitlement to the SARs, and in dismissing Scholastic's claim for an accounting.

## DISCUSSION

We review *de novo* both the grant of Harris' motion for summary judgment and the denial of Scholastic's cross-motion, in each case construing the evidence in the light most favorable to the non-moving party. *VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 118 (2d Cir.2001), *as amended,* No. 99–7876, 2001 WL 328223 (2d Cir. Apr. 2, 2001); *see also Terwilliger v. Terwilliger,* 206 F.3d 240, 244 (2d Cir. 2000) (same standard of review for summary judgment motion and cross-motion). Summary judgment is only warranted upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

---

1. Citations to the complaint are to the "First Amended Complaint" filed on September 26, 1996.

I Harris' Entitlement to the Stock Appreciation Rights

Scholastic, in arguing that Harris is not entitled to the SARs, concludes that its obligation under the Agreement to provide them to the appellee never vested. Appellant points to the explicit language of the Agreement that conditions the vesting of the SARs on the continued "operations" of "HEI" for four, five, and six years after the venture's initial funding. From this premise the argument proceeds as follows: (1) "HEI" in the SAR provision, refers to the joint venture itself, and not Harris' preexisting company; (2) the joint venture was terminable at will by either party; (3) Scholastic, by words and conduct, terminated the joint venture; and (4) the SARs thus never vested because Scholastic terminated the joint venture prior to the vesting dates and a terminated joint venture does not have any "operations."

A. The Meaning of "HEI"

 The first contention is that "HEI's operations" refers to the joint venture itself, not to Harris' personal company, Harris Entertainment, Inc. Whether Scholastic terminated the venture is only relevant if "HEI's operations" denotes the newly formed business entity, since it is undisputed that Harris' pre-existing company continued to operate during the years in question. The parties agree that New York law controls our consideration of this issue. Under that law, we must construe the joint venture agreement to effectuate the intention of the parties as evidenced by the language they used, *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548, 634 N.Y.S.2d 669, 658 N.E.2d 715 (1995), and are therefore bound to enforce the terms of the agreement as set down in an integrated, written instrument, *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639

(1990). When the terms of a contract are ambiguous, reasonably subject to differing interpretations, a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties. *Curry Rd. Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990).

 Whether a writing is ambiguous is a question of law for a court, *W.W.W. Assocs.*, 77 N.Y.2d at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639, while the meaning of an ambiguous contract is a question of fact for a factfinder, *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir.2000). A contract is ambiguous where its terms "suggest more than one meaning" when viewed objectively by a reasonably knowledgeable person who has examined the context of the entire integrated agreement. *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir.1998). If contractual terms have a definite and precise meaning and are not reasonably susceptible to differing interpretations, they are not ambiguous. *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).

 We think the term "HEI" as used in the SAR provision of the Agreement is ambiguous. A superficial inspection of the agreement might lead one to conclude that "HEI" refers to Harris' private corporation throughout. For example, the introductory sentence of the Agreement defines the parties to the agreement, stating that "[t]he following shall set forth the agreement between Harris Entertainment, Inc. ('HEI') and Robert Harris ('Harris') on the one hand, and Scholastic Productions, Inc. ('SPI')." Agreement at 1. Further, paragraph 1(b) of the Agreement provides that "SPI will enter into a separate joint venture (the 'Scholastic–HEI Joint Venture') with HEI pursuant to which SPI agrees to provide certain development and produc-

tion funds to HEI and HEI agrees to provide the services set forth in [the Agreement]." *Id.* ¶ 1(b), at 1. It is clear from this language that in these instances "HEI" refers to Harris' preexisting company in its role as the managing partner of the joint venture.

But, the meaning of "HEI" as used in later provisions of the Agreement is not so self-evident. Paragraph 2 provides in pertinent part that "Robert Harris shall enter into an employment agreement with HEI," *id.* ¶ 2, at 5, and paragraph 4—the one that contains the SAR provision—sets forth Harris' compensation, including "500,000 in annual salary in each of HEI's first three years of operations" and "one-third of the production/overhead fees HEI receives in connection with each theatrical motion picture HEI produces," *id.* ¶ 4, at 6–7. "HEI" would appear ostensibly to refer to the joint venture itself in these provisions. It would appear to be superfluous for the Agreement to provide that Harris enter into an employment contract with his own personal company. Harris makes the reasonable, but less obvious assertion, that HEI still refers to his company in these provisions, for under the terms of the Agreement, Scholastic had the right to acquire a 50 percent equity interest in "HEI," and thus an employment agreement was necessary to ensure his continued compensation at the defined scale.

 In determining whether a contract is ambiguous, a court must look at "the entire integrated agreement," to "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094–95 (2d Cir.1993) (rider to retirement agreement ambiguous in light of cumulative language of rider, retirement agreement, and original pension plan). Heeding these principles, Harris' claim

that the term HEI is unambiguous appears strained when viewing the Agreement as supplemented by the Twenty–First Amendment.

Paragraph 1(b) of the Agreement defines Scholastic's right to an equity election, providing that "SPI shall have the right at any time to acquire ('SPI's Equity Election') 50% of the equity of HEI (*i.e.,* HEI shall be obligated to assign to SPI common stock in HEI representing 50% of the equity of HEI)." Agreement ¶ 1(b), at 2. The Twenty–First Amendment stipulates that henceforth Scholastic was no longer obligated to provide funding for development or overhead, and "SPI is now vested with respect to its fifty percent (50%) interest in *the joint venture.*" Twenty–First Amendment ¶ 7, at 3–4 (emphasis added). Whereas the Agreement provided for an equity interest in "HEI," the Twenty–First Amendment indicated that Scholastic had established an equity interest in the joint venture itself. The interchangeable use of the terms HEI and joint venture in these provisions leads to the reasonable inference that the terms were used interchangeably throughout the Agreement. Thus, "HEI," as used in the SAR provision, is ambiguous.

. When the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for a jury to resolve, thereby precluding summary judgment. *Seiden Assocs.,* 959 F.2d at 428; *see also Alexander & Alexander Servs.,* 136 F.3d at 86. Only in the rare case is the extrinsic evidence so one-sided that no reasonable factfinder could find to the contrary, in which event the court should resolve the ambiguity as a matter of law. *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 159 (2d Cir.2000).

There is considerable extrinsic evidence in the record bearing on the meaning of "HEI," including evidence that suggests the reason for the term's ambiguity. At the time of the execution of the Agreement, the parties apparently were unsure of what business form to use in conducting their proposed collaboration. Harris testified, "What it's [the Agreement] saying is that they refer to HEI as the joint venture because they had not yet decided what the structure was going to be, whether it was going to be a joint venture, a partnership, a limited partnership, a corporation." Harris Tr. at 620. According to his testimony the parties did not confirm that the structure of the entity was to be a joint venture until August 28, 1991 and thereafter, joint venture business was conducted under the name "Harris & Company."

A jury must discern the parties' intended meaning of "HEI" in the SAR provision, as the interpretation of the term is not so obvious that reasonable factfinders could not disagree. Cf. Compagnie Financiere, 232 F.3d at 159. In determining the term's meaning, the jury might consider the conflicting positions taken by the parties during the course of this litigation, including: (1) Scholastic's complaint, which intimates that at least some of the references in the Agreement to HEI are to Harris' personal corporation, Compl. ¶¶ 11, 39; (2) deposition testimony by both Harris and his attorney, who represented Harris during the negotiation of the Agreement, that "HEI's operations," as used in the SAR provision, referred to the operations of the joint venture, Harris Tr. at 614–19, 631, Evans Tr. at 355–56, 483; and (3) an affidavit by Harris' executive compensation expert, who opines that the SAR provision is linked to the continuance of the joint venture, Hall Aff. ¶¶ 12–16.

### B. The Meaning of "Operations"

■ Further, the vesting of the SARs is linked to the continued "operations" of "HEI" for four, five and six years after the funding date. Scholastic asserts that the joint venture (i.e. "HEI") was terminable at the option of either party, and that it dissolved the venture by its words and conduct, thereby terminating the entity's "operations." Harris counters that even assuming the joint venture was terminable at will, and that Scholastic in fact dissolved it—points he strongly contests—HEI's "operations" nevertheless persisted post-termination for the purposes of winding-up and liquidating the entity.

The issues to be resolved are whether the term "operations" should be given an expansive or narrow meaning, and whether the unilateral dissolution of the venture would necessarily prevent the SARs from vesting. We find that, as with "HEI," the term "operations" is reasonably susceptible to differing interpretations, and accordingly a jury should have the task of discerning the parties' intended meaning. See Seiden Assocs., 959 F.2d at 428. Since the resolution of this ambiguity will hinge on the application of New York joint venture law, we turn to that topic.

### 1. Dissolution and Winding–Up

■ Under New York law joint ventures are governed by the same legal rules as partnerships, see Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton, 888 F.2d 239, 243 (2d Cir.1989), because a joint venture is essentially a partnership for a limited purpose, Gramercy Equities Corp. v. Dumont, 72 N.Y.2d 560, 565, 534 N.Y.S.2d 908, 531 N.E.2d 629 (1988). The statute governing partnerships in New York draws a distinction between the dissolution of a partnership, occurring when a partner ceases to be associated with the partnership, and the partnership's ultimate termination, which

occurs when the partnership is wound-up. Dissolution is not termination; instead the partnership "continues" until the winding-up of its affairs is completed. *See* N.Y. Partnership Law §§ 60, 61 (McKinney 1988). But the word "continues" in § 61 is not a statutory prolongation of the business life of an otherwise unviable entity. *Pastor v. State Tax Comm'n,* 115 A.D.2d 144, 146, 495 N.Y.S.2d 515 (3d Dep't 1985).

■ New York law limits a dissolved partnership's assumption of future liabilities to those necessary for the winding-up process. N.Y. Partnership Law §§ 64, 66(1)(a) (McKinney 1988). As we said in *C–TC 9th Avenue Partnership v. Norton Co.* (*In re C–TC 9th Avenue Partnership*), "[u]pon dissolution, the partnership is relieved of its responsibilities, duties and powers except for completing transactions unfinished at dissolution." 113 F.3d 1304, 1309 (2d Cir.1997) (holding that a dissolved partnership may not reorganize under Chapter 11 of the Bankruptcy Code); *see also In re C–TC 9th Ave. P'ship,* 193 B.R. 650, 653 (Bankr.N.D.N.Y.1995) ("[A] partnership in dissolution generally ceases carrying on of business in its normal course and its activities are limited to closing up partnership affairs, disposing of assets and paying all creditors."), *aff'd,* 196 B.R. 666 (N.D.N.Y.1996), *aff'd,* 113 F.3d 1304 (2d Cir.1997).

■ Following dissolution, the thrust of the partnership shifts from fulfilling prospective obligations, to winding-up the partnership's existing business affairs and devising a method to distribute its assets. *See Bayer v. Bayer,* 215 A.D. 454, 472–73, 214 N.Y.S. 322 (1st Dep't 1926). To the extent a jury may conclude that the parties intended that the term "operations" refer to the venture actively assuming future obligations—by the acquisition of new projects and the subsequent collaborative development of the projects—a dissolved partnership would not qualify. A jury might reasonably find the parties did not intend that the liquidation of the joint venture's assets would extend its duration, but rather that the venture's "operations" would cease upon dissolution. If this is found to be the parties' intent, the critical inquiry becomes whether Scholastic notified Harris of its intention to dissolve the venture.

### 2. *Section 62 of the New York Partnership Law*

A partnership may be dissolved without consequent liability "[b]y the express will of any partner when no definite term or particular undertaking is specified." N.Y. Partnership Law § 62(1)(b) (McKinney 1988). When the agreement specifies a durational term, or a defined project, an attempt unilaterally to dissolve the partnership would violate the partnership agreement. N.Y. Partnership Law § 62(1)(a).

The district court did not address whether the partnership was terminable at will, nor did it definitively indicate whether it believed Scholastic attempted to dissolve the joint venture prior to or during this litigation. But the district judge did state at the oral argument on the motions for summary judgment that he did not believe the joint venture was one at will. This view was not incorporated as a finding in the order.

■ Whether a partnership is terminable at will is a question of fact, and the jury should determine what the parties intended if the agreement does not fix an express duration. *Hooker Chemicals & Plastics Corp. v. Int'l Minerals & Chemical Corp.,* 90 A.D.2d 991, 991–92, 456 N.Y.S.2d 587 (4th Dep't 1982). Harris contends the duration of the joint venture is sufficiently ascertainable to support his

view that the collaboration was intended to endure for an express term, rather than terminate at will. Harris avers the venture's commencement date is clear—beginning with Scholastic's initial funding—and that the parties' contemplated end date was when he no longer developed projects for the venture. Relying upon the New York Court of Appeals' pronouncement that an employment contract is not terminable at will if the boundaries of the employment period are "sufficiently ascertainable," *Rooney v. Tyson*, 91 N.Y.2d 685, 692, 674 N.Y.S.2d 616, 697 N.E.2d 571 (1998), Harris argues that the joint venture was for a fixed term.

We question whether the Court of Appeals would engraft the relatively amorphous *Rooney* standard for employment contracts into the statutory mandates of § 62 of the New York Partnership law. *See Rooney*, 91 N.Y.2d at 693, 674 N.Y.S.2d 616, 697 N.E.2d 571 ("It is imperative, too, that we emphasize that the aspect of New York's jurisprudence that we propound today in no way alters the force and effectiveness of general long-standing principles relating to commercial agreements, otherwise governed by common-law or statutory standards."). Moreover, the joint venture agreement does not appear to contain a provision analogous to the contractual limitation in *Rooney*, which expressed that the contract was only effective "for as long as the boxer fights professionally." *Id.* at 687, 674 N.Y.S.2d 616, 697 N.E.2d 571. Thus, the Agreement at least on its face does not reflect a fixed duration. Absent any definite term of duration, the joint venture arguably is one at will. *See Shandell v. Katz*, 95 A.D.2d 742, 743, 464 N.Y.S.2d 177 (1st Dep't 1983).

Neither does the Agreement indicate that it contemplates that the venture last until the accomplishment of a "particular undertaking" as recognized under § 62(1)(a). Rather, the Agreement's "Projected Corporate Activities" of the venture are varied, including "the development, packaging, production and distribution of theatrical feature films ('A' titles), while also involved ... in television development and production." Agreement ¶ 3, at 6. Such an open-ended statement of purpose does not accord with a partnership formed to perform a particular project. *Compare St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*, 202 A.D.2d 844, 844–45, 609 N.Y.S.2d 370 (3d Dep't 1994) (partnership to develop factory outlet on parcel of land is for particular undertaking), *with Sanley Co. v. Louis*, 197 A.D.2d 412, 413, 602 N.Y.S.2d 605 (1st Dep't 1993) (partnership to acquire, manage and resell residential real estate is terminable at will).

Nonetheless, on remand, the jury may take into account any extrinsic evidence that shows the parties did not intend for the joint venture to be terminable at will, *see Hooker Chems.*, 90 A.D.2d at 991–92, 456 N.Y.S.2d 587, including an unexecuted draft agreement, purportedly rejected by Harris, that would have expressly given Scholastic a unilateral right to terminate.

### 3. *Scholastic's Alleged Dissolution of the Joint Venture*

■■■ If the jury were to find that the term "operations" is predicated upon the joint venture existing in a non-dissolved state *and* that the joint venture was terminable at will, the jury should then determine whether Scholastic took sufficient action to effect a dissolution. Although the trial court did not explicitly rule whether Scholastic attempted to dissolve the partnership, it did express skepticism regarding Scholastic's insistence that it had notified Harris of its intent to do so. *See Scholastic*, 80 F.Supp.2d at 149–50.

That court noted there was "no document in the record that expresses such a termination," and Scholastic's complaint did not expressly plead the venture had been dissolved. *Scholastic*, 80 F.Supp.2d at 150. Further, it held that while Scholastic's filing of the instant lawsuit could, under some circumstances, constitute notice of a desire to dissolve the partnership, it does not "effect a quitclaim" of plaintiffs' obligations to defendants. *Id.*

It is unclear what the district court meant by stating that a desire to dissolve the partnership would not "effect a quitclaim" of Scholastic's obligations under the SAR provision. If the court believed that the SARs vested regardless of whether "HEI" continued to "operate," such holding would be in error, as it would contravene the express terms of the Agreement. The Agreement conditioned the vesting of the SARs on "HEI's" continued "operations" for four, five and six years after the initial funding. A jury must thus initially determine what the parties intended the meaning of these ambiguous terms to be, and in turn, whether the vesting provisions were satisfied. If the vesting of the SARs was predicated upon the joint venture's continuance in a non-dissolved state, then Scholastic's termination of the venture would preclude its obligations under the SAR provision.

█ Scholastic produced sufficient evidence, if credited by a jury, for it reasonably to find that through words and conduct Scholastic dissolved the joint venture. If—and when—the joint venture was dissolved is a prototypical fact question that a jury must determine. *See Sagus Marine Corp. v. Donald G. Rynne & Co.*, 207 A.D.2d 701, 702, 616 N.Y.S.2d 496 (1st Dep't 1994) (summary judgment improper because issue of fact as to when joint venture was dissolved).

█ Appellant's proof is shown through a series of events beginning in 1992—including, Scholastic's writing the joint venture off its books for tax purposes and its cessation of funding, Harris' relocation of his offices to Universal Studios, and the parties' declining contacts with one another. All of this could reasonably be construed as indicating that the parties were no longer acting collaboratively. Scholastic's most probative evidence on the issue of dissolution is the testimony by its attorneys that they informed representatives for Harris in 1993 that the joint venture was terminated and that they believed Harris was thus not entitled to the SARs. Spiegel Tr. at 160–61; Frankfurt Tr. at 180–81. Similarly, a June 8, 1994 "memorandum to file" by Martin Keltz, as president of Scholastic Productions, Inc., purportedly memorialized a conversation in which Keltz informed Harris that "ours is a business association that has been terminated."

█ The district court's failure to credit the deposition testimony, in particular, was an inappropriate resolution of a witness' credibility on a motion for summary judgment. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996) (holding that when ruling on a summary judgment motion court should not assess the credibility of witnesses, which is solely within the province of the jury). Nor was it proper for the trial court to demand documentary proof of Scholastic's purported attempts to dissolve the venture, since a joint venture at will may be dissolved "by conduct as well as words," *Bayer*, 215 A.D. at 473, 214 N.Y.S. 322. Such dissolution occurs when either party manifests "an unequivocal election" to cease the collaboration. *Cracco v. Cracco*, 25 A.D.2d 660, 660, 268 N.Y.S.2d 97 (2d Dep't 1966) (refusal to pay plaintiff his share of partnership proceeds and provide

accounting constituted an election to dissolve partnership); *see also Mills v. O'Donnell*, 188 A.D.2d 692, 693, 591 N.Y.S.2d 83 (3d Dep't 1992) (plaintiff's sale of her interest in sole asset of partnership, a thoroughbred stallion, manifested an "unequivocal election" to dissolve partnership at will).

▇ Scholastic declares moreover, that regardless of the jury's findings with respect to pre-litigation dissolution, the joint venture was dissolved as a matter of the law by the commencement of the instant suit and its accompanying request for an accounting. This declaration misstates the settled law in New York which holds that bringing a suit for an accounting by a co-venturer will not *ipso facto* dissolve a partnership. *See Posner v. Posner*, 280 A.D.2d 318, 720 N.Y.S.2d 465, 466 (1st Dep't 2001) (action for accounting, where plaintiff disclaimed intent to terminate venture, did not dissolve partnership). Plaintiff must give notice of his intent to terminate. *See id.* Nor do we believe that the complaint itself is so unambiguously worded as to support a finding that its filing effected a termination as a matter of law. The complaint is couched in cryptic comments and does not clearly evidence an intent to dissolve a then-existing joint venture. Its allegation that "[a]ll that remains of the Joint Venture is to liquidate its assets," Compl. ¶ 39, hardly expresses that by its issuance the venture was thereby dissolved.

In *Brady v. Powers*, 112 A.D. 845, 98 N.Y.S. 237, 240–41 (1st Dep't 1906), *aff'd as modified*, 188 N.Y. 626, 81 N.E. 1160 (1907), the court found that a partnership was not dissolved by the plaintiff's complaint that sought an accounting but assumed the partnership was still in existence. The court did hold that the defendant's answer was sufficient to dissolve the partnership, but the intent of the *Brady* defendants was much less equivocally expressed than in the instant pleadings. *See id.* at 241. The answer in *Brady* stated

> There is no partnership now existing between the plaintiff herein and the defendants in this action, and that every and all business relations heretofore existing between the plaintiff and these defendants have terminated and ceased to exist, and do not now exist, and have not existed at the commencement of this action.

*Id.* Absent language such as this which clearly manifests the intent of the parties that the partnership be deemed dissolved, we decline to hold as a matter of law that the filing of a complaint—without more—changed the status of the joint venture.

### 4. Pre–Dissolution Obligations of the Venture

▇ A possible finding of the jury on remand is that the term "operations" was intended to have a narrow meaning, referring only to the continued collaboration of the parties in seeking out and developing new projects. Scholastic's purported dissolution of the joint venture would then terminate the venture's "operations," and prevent the SAR obligation from vesting. However, a jury might ascribe an alternative meaning to the SAR provision's terms, holding that the venture's "operations" nevertheless could continue even if Scholastic unilaterally dissolved the business entity. This conclusion would be premised upon the notion that a partnership carries on for limited purposes after dissolution.

▇ Although the partnership statute prohibits partners from assuming new obligations unrelated to the winding-up process after it is dissolved, N.Y. Partnership Law §§ 64, 66(1)(a), it does not preclude the completion of transactions already begun but not yet finished, nor does dissolu-

tion discharge the existing pre-dissolution liabilities of the partners, *id.* §§ 64, 66(1)(a), 67(1). *Stem v. Warren,* 227 N.Y. 538, 125 N.E. 811 (1920), is illustrative of New York's approach to executory contracts between a joint venture and a third-party that are incomplete at the time of the venture's dissolution.

In *Stem,* two architectural firms, Reed & Stem and Warren & Wetmore, agreed to jointly design and supervise the construction of New York's Grand Central Station. *Id.* at 542–43, 125 N.E. 811. They entered into a joint venture agreement with New York Central Railroad to provide architectural services, which agreement named Charles A. Reed, a partner in Reed & Stem, as the chief executive of the collaboration. *Id.* at 543–44, 125 N.E. 811. Reed died in 1911, seven years after the date of contract, but prior to the completion of construction, causing a dissolution of the venture. *Id.* at 544–45, 125 N.E. 811. Thereafter, a partner in Warren & Wetmore, the second firm, without the knowledge of the remaining co-venturer from Reed & Stem, requested that his firm replace the joint venture. *Id.* at 545, 125 N.E. 811. Pursuant to this request, the railroad canceled the original contract and executed a new one naming Warren & Wetmore as the sole architects. *Id.*

In a suit brought by the surviving partner of Reed & Stem, the Court of Appeals held that Warren & Wetmore had usurped a joint venture asset by unilaterally completing the architectural agreement. *Id.* at 546–47, 125 N.E. 811. The court found that although Reed's death dissolved the joint venture, the parties intended that the contract continue despite the dissolution. *Id.* at 547, 125 N.E. 811 (holding that surviving parties were bound by the contract's obligations and entitled to the benefits). The agreement with the railroad was thus a joint venture asset that the co-

venturers had an obligation to perform. The court then distinguished this right to complete the original joint venture agreement from plaintiff's "reasonable expectation" of entering into a second contract which, although related, was not secured at the time of dissolution and thus was not a joint venture asset. *Id.* at 550, 125 N.E. 811.

Accordingly, under *Stem,* if an executory contract with a third party contemplates that it should survive dissolution, it remains a joint venture asset and the co-venturers have an obligation to perform with the concomitant right to its benefits. *See also St. Lawrence Factory Stores,* 202 A.D.2d at 845–46, 609 N.Y.S.2d 370 (question of fact concerning whether individual may enforce agreement with third party to develop commercial property after individual's former partner dissolved partnership); *cf.* II Alan R. Bromberg & Larry E. Ribstein, *Bromberg and Ribstein on Partnership* § 7.14(b), at 228 (2000) (successor to *Crane and Bromberg on Partnership* ) ("Dissolution alone does not necessarily terminate executory contracts of the partnership. Whether it has this effect depends partly on the terms of the contract.").

In the instant case, the jury might find that after Scholastic's purported termination of the venture, Harris continued to work on pre-dissolution third-party contracts that were intended to survive a potential dissolution of the partnership. Harris maintains that after the parties agreed to the Twenty–First Amendment— thereby terminating Scholastic's funding obligations—he continued to perform development and production work on a number of joint venture projects pursuant to existing third-party contracts. As examples he cites agreements with MCA Television for projects called "Full Term" and "Twilight Man," an agreement with Para-

mount Pictures for "Dad's Week Off," an agreement with Interscope Communications for "Frank," and an agreement with Regent Entertainment for "The Boo Bothers." If the jury were to hold that the contracting parties expected that these third-party agreements would survive dissolution and that the term "operations" was intended to have a broad meaning that would include post-termination work on pre-dissolution contracts, it might then hold that Harris' right to the SARs vested despite the purported dissolution of the joint venture. As stated, what was intended is a jury question.

## II Scholastic's Right to an Accounting

The district court also inappropriately granted summary judgment to Harris on Scholastic's demand for an accounting of the joint venture. New York law provides that partners are entitled to an accounting of a partnership following its dissolution. N.Y. Partnership Law § 74 (McKinney 1988). Thus, "[u]pon notice of dissolution and the demand for an accounting, any partner has a right to an immediate accounting as of the date of dissolution." *220–52 Assocs. v. Edelman*, 241 A.D.2d 365, 367, 659 N.Y.S.2d 885 (1st Dep't 1997); *see also Shandell*, 95 A.D.2d at 743, 464 N.Y.S.2d 177. If the jury should find on remand that Scholastic had in fact dissolved the partnership, Scholastic would be immediately entitled to the equitable remedy of an accounting.

The district court's reliance upon our decision in *Leveraged Leasing Administration Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir.1996), to deny Scholastic's claim is misplaced. The district court intimated that Scholastic sought an accounting essentially to quantify the measure of damages available to appellant under its contract and tort causes of action. *Scholastic*, 80 F.Supp.2d at 152–53. Since

the court rejected Scholastic's other claims, it found no basis to direct an accounting. *Id.* at 153. This was error. If upon remand the jury should find that the joint venture was dissolved, Scholastic is entitled to an accounting irrespective of whether or not Harris breached the terms of the joint venture agreement. *See Shandell*, 95 A.D.2d at 743, 464 N.Y.S.2d 177 (upon dissolution partners are entitled to accounting).

On appeal, Harris maintains that Scholastic is not entitled to an accounting because it has been given financial reports regarding the condition of the venture since the collaboration's inception. This contention is without merit. Even if Scholastic already possesses detailed financial information regarding the joint venture, there is nevertheless still "an absolute right to an accounting." *Koppel v. Wien, Lane & Malkin*, 125 A.D.2d 230, 234, 509 N.Y.S.2d 327 (1st Dep't 1986). Harris' willingness to keep Scholastic abreast of the financial condition of the venture heretofore does not impair Scholastic's right to an accounting upon dissolution. *See Ordinary Guy, Inc. v. Juniper Releasing, Inc.*, 199 A.D.2d 251, 252, 604 N.Y.S.2d 226 (2d Dep't 1993) (plaintiff's right to audit defendant's records was not a substitute for judicial accounting); *CCG Associates I v. Riverside Associates*, 157 A.D.2d 435, 441–42, 556 N.Y.S.2d 859 (1st Dep't 1990) (provision of voluntary "interim accounts" did not preclude judicial accounting).

Finally, we note there is authority in New York to support a judicial accounting should the jury ultimately conclude that Scholastic never dissolved the venture. Generally, New York courts will only grant an accounting upon the dissolution of the partnership. *See Arrants v. Dell Angelo*, 73 A.D.2d 633, 633, 422 N.Y.S.2d 761 (2d Dep't 1979) (listing dissolution of partnership as one of the five necessary elements

to receive an accounting). But sections 43 and 44 of the partnership statute allow for an accounting—even absent dissolution— where a partner alleges a breach of fiduciary duty or a wrongful exclusion, when such is provided for by agreement, or where otherwise "just and reasonable." N.Y. Partnership Law §§ 43, 44 (McKinney 1988); *see also* Bromberg & Ribstein, *supra,* at § 6.08(b), at 172–73 (Uniform Partnership Act, which New York adopted as its partnership statute, purposefully authorizes pre-dissolution accounting).

Although the exception, New York courts have on occasion granted an accounting while the partnership's operations continued. *See Bailly v. Betti,* 241 N.Y. 22, 27, 148 N.E. 776 (1925) ("A court of equity will entertain an action for an accounting, where it is necessary so to do in order to compel one partner to carry out his agreement with another one in the transaction of copartnership business even though a dissolution is not asked for."); *Posner,* 720 N.Y.S.2d at 466–67 (plaintiff disclaimed intent to terminate venture in action for accounting); *St. James Plaza v. Notey,* 95 A.D.2d 804, 805, 463 N.Y.S.2d 523 (2d Dep't 1983) (evidence of illegal conduct in connection with partnership); *Alpert v. Haimes,* 64 Misc.2d 608, 611, 315 N.Y.S.2d 332 (N.Y.Sup.Ct.1970) (breach of fiduciary duty); *see also Paretti v. Cavalier Label Co.,* 702 F.Supp. 81, 85 (S.D.N.Y. 1988); *cf. Lord v. Hull,* 178 N.Y. 9, 19–20, 70 N.E. 69 (1904) (pre-New York Partnership statute).

Consequently, if on remand the jury determines that the joint venture was not dissolved, the court may consider whether Scholastic is nonetheless entitled to a pre-termination accounting.

## CONCLUSION

For the foregoing reasons, we affirm the denial of Scholastic's motion for summary judgment on its claim for a declaratory judgment; and we vacate the grant of summary judgment in favor of Harris on his breach of contract claim, and the dismissal of Scholastic's claim for an accounting. We remand these issues to the district court for further proceedings not inconsistent with this opinion.