**MINERALS TECHNOLOGIES, INC.**
**and Specialty Minerals Inc.,**
**Plaintiffs,**

v.

**OMYA AG, Omya Industries Inc.,**
**and Omya, Inc., Defendants.**

No. 04 Civ. 4484(VM).

United States District Court,
S.D. New York.

Dec. 21, 2005.

Anthony J. Costantini, Duane Morris, LLP (NYC), New York, NY, Laura Danielle, Sutherland Asbill & Brennan LLP, Atlanta, GA, Patricia Bayer Cunningham, Sutherland Asbill & Brennan LLP, Atlanta, GA, Anthony J. Costantini, Duane Morris, LLP (NYC), New York, NY, for Minerals Technologies, Inc., Specialty Minerals, Inc.

Jeffrey T. Golenbock, Golenbock Eiseman Assor Bell & Peskoe LLP, New York, NY, for OMYA AG.

### DECISION

MARRERO, District Judge.

Plaintiffs Minerals Technologies Inc. ("MTI") and Specialty Minerals Inc. ("SMI") (collectively, "Plaintiffs") and Defendants Omya AG, Omya Industries, Inc., and Omya, Inc., (collectively, "Omya") dispute the interpretation of a Settlement Agreement between the parties in which the parties purported to limit the issue for trial. The parties entered into a Settlement Agreement (the "Agreement") in this action and a related action [1] on November 22, 2005. The Agreement resolved a number of the disputes between the parties and was intended to narrow the scope of this proceeding. The Court's review of the parties' pre-trial memoranda alerted the Court to a fundamental disagreement that had arisen between the parties concerning the dimensions of the remaining issue before the Court. The parties then submitted supplemental memoranda setting forth their respective positions regarding the scope of the remaining issue.

Omya argues that the Agreement must be read to limit the issue to be resolved by the Court to whether the amount of carbonic acid formed during the August 2004 Stora Enso North America Trial (the "August SENA Trial") met the Weak Acid Requirement of the patents at issue in the proceeding.[2] The Agreement defines the "Weak Acid Requirement" as the require-

ment "that at least about 0.1 weight percent of weak acid be used" in the mixture of substances employed to create the paper product that is the subject of the Patents. (Settlement Agreement (the "Agreement"), attached as Exhibit A to Minerals Technologies Inc. and Specialty Minerals Inc.'s Pre–Trial Memorandum Regarding Scope of Issues at and Timing of Mini-Trial ("Pls.' Mem."), dated December 16, 2005.) Plaintiffs respond that the Agreement must be read to define the issue more broadly. They argue that the question to be determined by the Court is whether the Weak Acid Requirement was met during the SENA Trial either by the formation of carbonic acid or by the amounts of carbon dioxide originally injected into the mixture or by the bicarbonate the chemical reaction produced, both of which Plaintiffs contend are classified as weak acids, or by a combination of the three acids.

The Court has reviewed the parties' submissions and has carefully reviewed the language of the Agreement. As discussed below, the Court finds that the Agreement must be read to call for Court determinations beyond a narrow ruling on whether the amount of carbonic acid formed by the addition of carbon dioxide during the SENA Trial met the Weak Acid Requirement. The Court concludes that the Agreement requests the Court to adjudicate what constitutes a "weak acid" for purposes of the Weak Acid Requirement and whether the use of carbon dioxide, bicarbonate, or other weak acids in creating the paper product covered by the Pat-

1. The related action, *Specialty Minerals, Inc. v. Pluess–Staufer AG, Pluess–Staufer Industries, Inc., and Omya, Inc.*, was filed under Docket No. 98 Civ. 7775(VM). For a factual recitation of the history of this litigation and the issues originally in dispute, *see Minerals Technologies Inc. v. Omya AG*, 339 F.Supp.2d 528 (S.D.N.Y.2004).

2. The patents at issue in this litigation are U.S. Patent No. 5,043,017 and U.S. Patent No. 5,526,719 (collectively, the "Patents"). (*See* Settlement Agreement ("Agreement"), attached as Exhibit A to Pls.' Mem., at ¶ 4.)

ents might individually or in combination meet the Weak Acid Requirement.

## I. APPLICABLE PRINCIPLES OF CONTRACT INTERPRETATION

 A settlement agreement must be interpreted according to the doctrines governing contract interpretation. *See Wal-Mart Stores, Inc. v. Visa U.S.A.*, 129 Fed. Appx. 676, 677 (2d Cir.2005). Principles of contract interpretation require that a contract be interpreted in a manner that ascribes meaning to all provisions of the contract. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible."); *Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 272–73 (2d Cir.1992) ("A court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms." (citations omitted)).

 Under New York contract interpretation doctrine, a contract is ambiguous where its terms suggest more than one meaning when viewed objectively by a reasonably knowledgeable person who has examined the context of the entire integrated agreement. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir.2001). The Court finds that the language of the Agreement is ambiguous in relation to the precise scope of the issue or issues intended to be submitted for resolution by the Court. The uncertainty derives from some provisions of the Agreement that can be read as limiting the issue the Court must decide at trial to only one: whether the amount of carbonic acid formed at the SENA Trial met the Weak Acid Requirement. Other provisions, however, call upon the Court to rule regarding the broader issue of whether the Weak Acid Requirement may be satisfied as well by use of substances other than carbonic acid that qualify as "weak acids." Where the terms of a contract are ambiguous, a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties. *See id.* However, the Court concludes that, with one exception, the Agreement can be reasonably interpreted in a manner that reconciles the apparent ambiguities without consideration of extrinsic evidence. Because the Court is obligated to interpret a contract as an integrated whole in a manner that gives meaning to all of its provisions, the Court must read the Agreement as defining more broadly the matters before it for resolution at trial, as set forth below.

## II. ANALYSIS

 Both parties ground their respective interpretations of the Agreement on the language of Paragraph 4 of the Agreement. The first section of Paragraph 4 reads as follows:

> Although the parties have agreed to settle the Antitrust and Patent Actions as set forth above, they continue to disagree as to the requirement in U.S. Patent No. 5,4043,017 (the "'017 Patent") and U.S. Patent No. 5,516719 (the "'719 Patent") that at least about 0.1 weight percent of weak acid be used (the "Weak Acid Requirement"); specifically, the parties disagree whether the Weak Acid Requirement was met in connection with the papermaking trial that took place at Stora Enso North America, in Duluth, Minnesota, in August 2004 (the "August SENA Trial").

(Settlement Agreement ("Agreement"), attached as Exhibit A Pls.' Mem., at ¶ 4.) This first sentence of Paragraph 4 can be read to frame the unresolved dispute between the parties as a broad issue about which they "continue to disagree." That

question is explicitly described as relating to the Weak Acid Requirement and more specifically as to whether that requirement was met at the August SENA Trial. As formulated, the sentence cannot be read to limit the open dispute to simply whether carbonic acid formed at the SENA Trial met the Weak Acid Requirement. More broadly, this provision describes the parties' continuing disagreement as to whether the Weak Acid Requirement was met by any means during the August SENA Trial.

However, because Omya used carbon dioxide at the August SENA Trial, a more particularized dispute within the scope of the larger disagreement arose regarding whether carbonic acid formed by the use of carbon dioxide in that connection met the Weak Acid Requirement. Thus, Paragraph 4 goes on to place before the Court a narrower question of whether the carbonic acid formed at the SENA Trial satisfied the Weak Acid Requirement. This section reads:

> MTI contends that the amount of carbonic acid formed by the use of the $CO_2$ satisfied the Weak Acid Requirement. Omya denies that. The parties have agreed, subject to the approval of the District Court, to resolve this issue before Judge Marrero.

(Agreement at ¶ 4.) This provision of the Agreement clearly calls for the Court to adjudicate the issue of whether the amount of carbonic acid formed by the use of carbon dioxide at the August SENA Trial satisfied the 0.1 percent weight Weak Acid Requirement. In connection with this charge, the Court's function is limited to a particular event and to the presence of a quantity of a particular chemical: carbonic acid at the SENA Trial. However, this sentence, specific as it is, does not end the inquiry. For, the remainder of Paragraph 4 must be read to enlarge the scope of the issues the parties request the Court to resolve by adding a second task: to make additional findings and render distinct rulings on related questions that are not strictly circumscribed by the results of the SENA Trial nor to any particular measure of carbonic acid.

In particular, the remainder of Paragraph 4 asks the Court, "in addition to" providing a "definitive ruling" on the issue of whether the Weak Acid Requirement was satisfied at the August SENA Trial, to make several other determinations concerning the chemical reactions of carbon dioxide in a paper furnish. The second task requests that the Court "also" provide an explanation of "the basis for its decision" that includes three distinct components: (1) a "detailed statement" of "its claim construction of the term 'weak acid' as it relates to the formation of carbonic acid through the addition of $CO_2$ to a paper furnish," "as well as" (2) an explanation regarding "the circumstances under which the addition of $CO_2$ to a paper furnish will meet the Weak Acid Requirement," "as well as" (3) "the circumstances when carbonic acid, alone or in combination with other weak acids, meets the Weak Acid Requirement." It evident that the Court could not address this second task and give effect to these broader provisions, and thus to the Agreement as a whole, if it were to limit the scope of the trial and the Court's ruling to simply the amount of carbonic acid formed at the August SENA Trial. Concomitantly, it would not be possible for the Court to provide any explanations in response to the three additional matters the Agreement lays before it for trial without an evidentiary record that extends beyond the narrow factual disagreement about the amount of carbonic acid produced by the chemistry of the August SENA Trial.

The first component of this three-part inquiry may be deemed narrow, to the extent it requires the Court's claim construction of the term "weak acid" as it pertains specifically to the formation of carbonic acid from carbon dioxide in a paper furnish. The second element, however, is much broader; it poses a more generic question of the circumstances under which the addition of *carbon dioxide* to a paper furnish "will meet" the Weak Acid Requirement. Implicit in this provision is that such circumstances exist. But, there is no limiting indication in the statement to suggest that if such conditions do exist they necessarily implicate the presence and operation of any amount of carbonic acid by itself in satisfying the Weak Acid Requirement. Thus, this provision can be read to request that the Court address the larger issue of the chemical effect of injecting carbon dioxide into a paper furnish and whether the addition of carbon dioxide would meet the Weak Acid Requirement, without reference to any role for any amount of carbonic acid formed and present in the slurry. Finally, as an offshoot of the preceding question, the third element contemplates that the Court rule on the circumstances under which carbonic acid, *"alone or in combination with other weak acids,* meets the Weak Acid Requirement." (Agreement, ¶ 4 (emphasis added).)

The provision calling for the Court to explain the circumstances regarding when carbonic acid, *alone or in combination with other weak acids,* meets the Weak Acid Requirement, presupposes that such circumstances occur, that such other "weak acids" exist and that the Court must identify them for the purposes of this aspect of the inquiry. Accordingly, the request must be read to intend that the issue before the Court is not solely whether the amount of carbonic acid formed during the SENA Trial met the Weak Acid Require-

ment, but rather a much broader disagreement between the parties regarding how the Weak Acid Requirement may be met either by the operation of carbonic acid itself or by carbonic acid in combination with "other weak acids." This provision of the Court's second task requires the Court to interpret the meaning of "weak acid," to determine what substances constitute "weak acids," and to determine whether the injection of carbon dioxide or potentially "other weak acids" to the paper furnish would satisfy the Weak Acid Requirement.

The reference to the term "other weak acids" in the third question before the Court presents a further ambiguity and interpretive difficulty for the Court. For, there is no explicit indication in this language necessarily circumscribing its meaning and intent to "weak acids" present at the SENA Trial. On their face, the term "other weak acids" is open-ended and technically could encompass the entire universe of substances that may properly be classified as such. Although contextually the language could be read to imply that the reference to "other weak acids" is meant to relate only to such acids present in the course of the chemistry of the August SENA Trial, there is nothing in the Agreement that specifically defines or limits what constitute "other weak acids" as the term is employed in this provision. Moreover, on the scientific record before the Court, there is insufficient documentation at this time to properly support a determination regarding whether substances not present at the SENA Trial may be classified as "weak acids" for purposes of the Weak Acid Requirement. Thus, further guidance from the parties may be required as to whether the term "other weak acids" is limited to any weak acids identified in the chemistry of the August SENA Trial, or is intended to apply more broadly to any other substance

that qualifies as a "weak acid." If the parties cannot agree, it is possible that further development of the scientific record may be necessary for the Court to rule on this issue.

Finally, the last sentence of Paragraph 4 spells out a third task for the Court. It records that the parties also continue to disagree as to "the proper application of the Doctrine of Equivalents, Prosecution Estoppel, and other legal issues as they relate to the Weak Acid Requirement," and asks the Court to "address these issues as well," to the extent they are raised by the parties. In connection with this request as well, especially as it relates to the Doctrine of Equivalents, the Court could not perform its charge properly without developing an evidentiary record at trial that encompasses the scientific and technical background relevant to a resolution of the issues in dispute.

As noted above, the Court must interpret a settlement agreement "in a way that ascribes meaning, if possible, to all of its terms." *Goodheart,* 962 F.2d at 272–73. Accordingly, with regard to Paragraph 4, to avoid rendering any of the provisions of Paragraph 4 meaningless, superfluous or contradictory, the Agreement must be read to request determinations from the Court on both the specific issue of whether carbonic acid met the Weak Acid Requirement at the SENA Trial and also the broader issue of whether carbon dioxide, bicarbonate, or "other weak acids," may satisfy the Weak Acid Requirement.

Furthermore, the provisions of Paragraph 7 of the Agreement similarly preclude the Court from interpreting the Agreement to present the narrow issue of whether carbonic acid met the Weak Acid Requirement at the SENA Trial and nothing else. Paragraph 7 states that Omya agrees that a papermaker's use of calcium carbonate provided by Omya, a calcium-chelating agent or conjugate, and a weak acid in the manner provided for in the Patents shall trigger Omya's obligation to pay MTI a license fee. The provision states that "for purposes of this Agreement . . . both phosphoric acid and carbonic acid are weak acids." It goes on to state that "there is no intent by this Agreement to limit what would *otherwise* constitute . . . a weak acid" (emphasis added). Therefore, the Agreement does not rule out the prospect that carbon dioxide or bicarbonate or indeed unstated other substances could constitute a weak acid for purposes of the Weak Acid Requirement of the Patents. Since the parties have explicitly agreed that the definition of "weak acid" is not limited to carbonic acid or phosphoric acid, the Court must consider the question of what constitutes a weak acid for purposes of the Weak Acid Requirement in order to make all of the determinations requested in the three distinct tasks described in Paragraph 4.

### III. CONCLUSION

For the reasons set forth above, the Court concludes that the Agreement defines the issues for trial as both the narrow issue of whether carbonic acid met the Weak Acid Requirements at the SENA Trial and the broader issue of what constitutes a weak acid for purposes of the Weak Acid Requirements. The Court could not render a "definite ruling" on whether the Weak Acid Requirement was satisfied at the August 2004 SENA Trial without addressing both the narrow and the broader aspects of the questions the parties have put before the Court.