**Rajesh SRIRAMAN, Plaintiff,**

v.

**Shashikant PATEL, Defendant.**

**No. 09 Civ. 5531 (BMC).**

United States District Court,
E.D. New York.

Jan. 24, 2011.

Saritha Chandrupatla Reddy, Gail Miriam Eckstein, Steven Cooper, Reed Smith LLP, New York, NY, for Plaintiff.

David Clifford Burger, Robinson Brog Leinwand Greene Genovese & Gluck, P.C., New York, NY, for Defendant.

### *CORRECTED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

COGAN, District Judge.

Plaintiff Dr. Rajesh Sriraman brings this diversity action against his former partner, defendant Dr. Shashikant Patel, asserting claims for an accounting and related claims. The parties practiced pulmonary and critical care medicine in two different medical partnerships from 2003 to 2008. However, they never entered into a written partnership agreement and never orally discussed the terms of their arrangement. Thus, the terms and scope of their partnership are in dispute.

At the center of this dispute are three contracts that defendant entered into in

2003. Two of them were with North Shore University Hospital at Forest Hills (hereinafter "Forest Hills Hospital")—a Critical Care Services Agreement and an employment agreement for Chief of the Department of Medicine (together, the "Forest Hills contracts"). The third was another contract to provide critical care to Queens–Long Island Medical Group, P.C. ("Q–LI Medical Group"). Plaintiff contends that defendant failed to disclose the existence of the Forest Hills contracts and improperly withheld the monies earned by the partnership under these contracts. Conversely, defendant maintains that plaintiff was aware of these contracts and that the money was not included in the partnership because they were not partnership opportunities. He further contends that if the Forest Hills contracts are deemed partnership property, then the Queens–Long Island contract, pursuant to which plaintiff received all the proceeds, should also be regarded as partnership property, and plaintiff should account for the proceeds he received.

This case was tried to the Court. For the reasons set forth below, the Court finds that plaintiff is entitled to judgment in the amount of $222,300.00.

### FINDINGS OF FACT

## I. Defendant's Prior Partnerships

Defendant has been practicing medicine since 1970. Since the mid–1980s, he has entered into a series of partnerships with different doctors for the purpose of practicing pulmonary and critical care medicine for patients in the Intensive Care Unit ("ICU") of different hospitals.

### A. *Patel Silverman LLP*

The first partnership defendant entered into was with Dr. Joel Silverman ("Silverman"). Silverman began working with de-fendant in 1983 and under the terms of his employment agreement, he would work as an employee of defendant's for three years and would receive a salary. Thereafter, he would become an equity partner and receive 50% of the partnership profits. In light of Silverman's exceptional work, defendant elevated him to partner after only a year. They established Patel Silverman LLP and entered into a written partnership agreement. Both agreed that for the first two years Silverman was a partner, defendant would receive $50,000 more per year, and by the third year the profits would be split 50/50. All of the partnership profits consisted of income from patient care that was provided by the doctors at both their office and at Parkway Hospital.

During the course of this partnership, defendant held several different positions at Parkway Hospital. These included: Director of the Pulmonary Medicine and Intensive Care Unit, Chief of Medicine, and Medical Director of the entire hospital. Defendant held both the Chief of Medicine and Medical Director positions from 1985 to 2003, and as compensation he received an annual salary of $75,000 plus health insurance. Defendant and Silverman agreed that defendant's salary would not be included as partnership income.

### B. *Patel Silverman Chadha LLP*

In the late 1980s, Dr. J.B. Chadha ("Chadha") began working with defendant and Silverman. Like Silverman, Chadha entered into an employment agreement which provided that he would receive a salary for the first three years of his employment, and then would become a full equity partner. After the three years were up, Chadha became a partner in Patel Silverman Chadha LLP ("PSC") and the doctors entered into a new written partnership agreement.

By this time, PSC was primarily responsible for taking care of the ICU at Parkway Hospital. Defendant remained the Medical Director of the hospital and he appointed Chadha as Chief of Pulmonary Medicine at Parkway Hospital, which was an unpaid position. Under their partnership agreement, the doctors limited the scope of their partnership to patient care and all of the income that the partners derived from patient care that was provided at the office and Parkway Hospital was divided equally amongst the three partners. However, there were a few years during which the partners agreed that Chadha would receive $50,000 more than defendant and Silverman. Moreover, although defendant did not explicitly discuss with Chadha that defendant's salary as Medical Director would be excluded as partnership income, Chadha was aware it was a paid position and made no objection.

On May 9, 1997, plaintiff joined PSC. As was the case with Silverman and Chadha, plaintiff entered into an employment agreement with PSC, effective July 1, 1997, under which he would receive a salary for the first five years of his employment, and that "at the end of the 5th Year you shall be entitled to an equity interest in the practice equal to that of the other members." The reason that PSC required plaintiff to work for five years, instead of three, before becoming a partner was due to the fact that he had just completed his medical training and had yet to pass all of his medical board certifications ("Boards").

During the first five years of his employment, plaintiff received a salary as provided under his employment agreement. He worked out of Parkway Hospital and performed essentially the same services as the other doctors in the partnership—he saw patients in the ICU, performed consultations, and admitted patients. However,

plaintiff continued to struggle to pass all of his Boards.

In plaintiff's fifth year of employment, PSC's practice had grown and defendant was looking to transition the partnership away from Parkway Hospital and to Forest Hills Hospital, which is a teaching hospital. Defendant had started engaging in discussions with Forest Hills Hospital about the possibility of him becoming Chairman of the Department of Pulmonary Medicine and having PSC provide services for the hospital's ICU.

In 2003, after his five years were completed, Plaintiff began receiving a 25% share of the profits in PSC and was listed as a partner on PSC's 2003 tax returns and balance sheets. However, he never received any confirmation that he had become a partner and was never offered a written partnership agreement. This was due in part to the fact that defendant was still finalizing negotiations with Forest Hills Hospital, but it was also because during that same year, Silverman and Chadha decided to leave the partnership.

## II. 2003 Contracts

Despite the pending termination of PSC and without entering into any formalized partnership with plaintiff, defendant executed three different contracts in 2003. Two were with Forest Hills Hospital and one was with Q–LI Medical Group.

### A. Chief of Medicine Contract

On March 22, 2003, defendant entered into an employment agreement with Forest Hills Hospital to serve as the Chief of their Department of Medicine ("Chief of Medicine Contract"). Under this agreement, defendant would receive a salary of $350,000 per year for a period of five years commencing on April 15, 2003. The agreement delineated defendant's duties as Chief of Medicine, which included adminis-

trative and teaching responsibilities, and noted that he was expected to allocate twenty-five hours per week to carrying out these duties. Moreover, the contract provided that "[d]uring the term of your employment and under this Agreement, you may render professional services as a private physician, consultant, or otherwise to the extent that rendering such services does not interfere with the full performance of your duties hereunder."

### B. *Critical Care Services Agreement*

Defendant also entered into a critical care services agreement with Forest Hills to provide intensivist, or critical care services, for the hospital ("FH–ICU Contract"). The agreement was for a five year period beginning July 1, 2003 and ending on June 30, 2008, and was subject to automatic renewal for an additional year. The draft version of this agreement was originally between Forest Hills Hospital and defendant, Silverman, Chadha, and plaintiff. However, because Silverman and Chadha had left PSC by the time the contract was executed, it was revised so that it was between the hospital and "Shashi Patel, MD (referred to as the 'Group')." Defendant signed the FH–ICU Contract.

The contract provided for the Group to perform both clinical and administrative duties. These duties included: creating monthly staffing schedules to ensure 24/7 coverage of the ICU; establishing procedures to ensure the consistency and quality of the clinical services being provided; participating in the hospital's overall performance improvement programs; and serving as active participants in the hospital's Medical Residency Training program by conducting lecture series and daily teaching rounds in the ICU.

It also set forth that defendant would appoint a Group employee to serve as Director of the Division of Critical Care. The Director would maintain overall responsibility of the ICU and would be required to devote at least 18 hours per week in performing general administrative and supervisory functions. However, the Director could designate other doctors to perform these duties as needed.

As compensation for both the clinical service and administrative services provided under the FH–ICU Contract, the hospital agreed to pay the Group the sum of $300,000 per year. This was $100,000 more than the amount set forth in the draft agreement. The $300,000 was to be disbursed in equal monthly installments of $25,000 by checks made payable to "Shashi Patel, MD."

### C. *Queens–Long Island Agreement*

Defendant also entered into an agreement with the Q–LI Medical Group to provide critical care services ("Q–LI Contract"). This one-year agreement was effective as of July 1, 2003, and was subject to automatic renewal for one year terms unless terminated as provided for in the contract. (It also renewed at all times relevant to this lawsuit.) As compensation, defendant would receive $250,000 annually, which would be paid in equal monthly installments.

### III. The Patel Sriraman Partnership

With the exodus of Silverman and Chadha, defendant and plaintiff were left to perform the services under these three contracts. For tax purposes, defendant and plaintiff continued to use the name Patel Silverman Chadha LLP until the end of 2004. On October 5, 2004, defendant filed a Certificate of Registration for Patel Sriraman LLP ("PS LLP") with the State of New York. Thereafter, the parties practiced under the name Patel Sriraman LLP until plaintiff left the partnership on June 30, 2008.

Although they never entered into a formal partnership agreement, the parties had a general understanding when they began working together that functionally speaking, defendant would be the "originating" or "managing" partner and plaintiff would be the "service partner." (These are the Court's terms to describe their relationship, not the parties'.) They also discussed the nature of their practice and how, in addition to providing critical care services at the hospital and seeing patients in their office, they needed to increase their presence at the hospital in order to grow their practice.

The manner in which the partnership work was divided is reflective of this managing vs. service partner relationship. Defendant made the majority of the management decisions, ran the practice on a day-to-day basis, established relationships with other doctors and the hospital, and focused on building the practice. He also exclusively performed the responsibilities of Chief of Medicine, and in January 2004, also assumed the position of Medical Director—one of the most important positions in the hospital. In fact, it was through these positions that defendant was able to increase the partnership's presence at Forest Hills Hospital and generate business for their ever-growing office-based practice.

As a service partner, plaintiff's primary duties were to provide patient care. He had full access to the partnership books and records, and occasionally would sign checks on behalf of the partnership, but had little if any involvement in the management of the partnership. Plaintiff was solely responsible for performing under

the Q–LI Contract, but both parties performed the duties under the FH–ICU Contract. When additional staffing was needed, defendant hired doctors to work on a per diem basis to perform clinical services and administrative services. These per diem doctors were paid out of the partnership's patient revenues; they did not receive any money from these contracts.

In regard to the Director of Critical Care position set forth in the FH–ICU Contract, defendant initially performed the functions of Director himself. In or around 2005, defendant appointed plaintiff to that position. However, plaintiff was unable to remain in that position because he had not passed his Board Certification in Critical Care Medicine.[1] Nevertheless, plaintiff continued to perform many of the Director duties and assisted defendant in carrying out the others.

Defendant also made all the decisions as to when draws would be made and how income would be divided. There was no set draw every year and the profit distribution varied annually. The Tax Returns and Balance Sheets for PS LLP from 2004 to 2008 report that the partnership profits were distributed as follows:[2]

| YEAR | PLAINTIFF | DEFENDANT | % PROFIT SHARING |
|------|-----------|-----------|------------------|
| 2004 | $182,120 | $187,198 | 50%–50% |
| 2005 | $183,518 | $183,518 | 50%–50% |
| 2006 | $245,380 | $142,245 | 63%–37% |
| 2007 | $114,223 | $ 80,158 | 59%–41% |
| 2008 | $112,895 | $ 39,216 | 78%–22% |

---

1. There was also a barrier to plaintiff holding this position because he was subject to an ongoing investigation by Medicare into overbilling, which began in 2004 and continued throughout the partnership.

2. These exact amounts are taken from the parties' stipulated facts; however, the Court notes that the evidence at trial indicated that the parties each received approximately $10,000 more in 2004. *See* Pl's Ex. 8, at 1.

However, defendant did not include monies earned from the three contracts he signed in 2003 as partnership income. He excluded his Chief of Medicine salary, for which he received a total of $1,822,918 between April 2003 and June 30, 2008. Although plaintiff was aware that defendant held this position and was receiving a salary, he never knew the details of the contract or exactly how much money defendant was earning. Unlike in his prior partnerships, defendant never discussed whether his salary as Chief of Medicine could be excluded as a partnership asset, and plaintiff never asked.

In regard to the critical care agreements, defendant allocated to plaintiff all of the money under the Q–LI Contract, and he kept all the money under the FH–ICU Contract. During the tenure of the partnership, plaintiff received a total of $849,599.96 under the Q–LI Contract and defendant received $1,500,000.00 under the FH–ICU Contract.

Defendant originally decided to distribute the contract income in this manner because when they first started working at Forest Hills Hospital, the practice was not generating any money, and he knew that plaintiff needed income. Defendant was receiving his salary as Chief of Medicine, and rather than have plaintiff wait to get paid from patient billing, defendant distributed all of the money under the Q–LI Contract to plaintiff, as he was performing all of that work.

Plaintiff was aware of the terms of the Q–LI Contract and in fact, signed an Addendum on February 16, 2005, modifying and supplementing the original agreement signed by defendant. This Addendum changed the contract so that it was between plaintiff and the Q–LI Medical Group, and directed payment to plaintiff.

Plaintiff had only seen the draft version of the FH–ICU Contract, and never saw the final version which increased the amount of the contract from $200,000 to $300,000 per year. Plaintiff suspected that a final agreement had been executed around 2003, but never questioned defendant as to its terms or whether the money earned from that contract was being included as partnership income.

Plaintiff did ask defendant whether the Director of Critical Care position was a paid position. Defendant indicated that the hospital usually pays a director of a subspecialty anywhere from $25,000–$50,000 per year, but noted that in their situation, the money for the Director position had been included in the FH–ICU Contract, so the position was unpaid.

There is no question that the purpose of the parties' partnership was to provide critical care medicine at both the hospitals for which they had contracts and at their office. Although the parties discussed the scope of their medical practice, they never discussed how profits would be divided or shared or from what revenue streams their profits would derive. Rather, defendant unilaterally made decisions as to how profits would be divided and what income would be deemed partnership income. The limited discussions these parties had regarding their partnership concerned the nature of the practice and their respective roles.

Defendant's positions as Chief of Medicine and Medical Director were vital to his success in expanding the practice and increasing the partnership's presence at the hospital. Conversely, it was plaintiff's work in the ICU providing patient care that enabled the partnership to satisfy its responsibilities under the FH–ICU Contract and generate revenue. Although plaintiff did not officially maintain the role of Director of Critical Care for an extended period of time, he did perform many of

those duties and assisted defendant with others over the course of the partnership.

## IV. Findings as to the Parties' Intent

█ There is no dispute that plaintiff was entitled to receive 50% of the partnership distributions. His employment letter so provided, and as noted below, the New York partnership law presumes equal sharing of profits absent agreement to the contrary.[3] There is also no dispute that this arrangement applied to patient billing, *i.e.*, bills sent out by the partnership for services rendered directly to patients. The sole issue in this case is which, if any, of the 2003 contracts constituted partnership property so that revenues received under those contracts had to be distributed pursuant to the 50/50 arrangement.

I find that defendant never considered the income from the Chief of Medicine Contract to be partnership property, and gave plaintiff no reason to expect otherwise. That contract in effect replaced the Chief of Medicine contract at Parkway Hospital that defendant had retained as his own property during his predecessor partnerships. Although defendant's position as Chief of Medicine may have brought additional patient billings into the partnership, that collateral benefit does not indicate that he considered the contract partnership property. In not sharing either information or revenues about that contract with plaintiff, defendant was simply carrying forward the arrangement he had under his prior partnerships.

I also find that plaintiff has not proven that he had any intent or reasonable expectation to the contrary during the term of the partnership. Although he knew in a general sense that defendant had various administrative positions, including Chief of Medicine, and received compensation for those, plaintiff never gave any indication that he considered himself entitled to share in the income from those activities until after he withdrew from the partnership. In addition, it is undisputed that plaintiff performed no work under this agreement. Given the historical precedent of the Chief of Medicine contract at Parkway Hospital; the fact that it is written in the terms of an employment contract with only defendant as the employee; plaintiff's failure to make a definitive inquiry about the contract during the term of the partnership; and the fact that plaintiff did not render services under that contract and did not expect to, it is not only clear that the parties never had a meeting of the minds as to whether the Chief of Medicine Contract would generate partnership revenue, but it is also clear that neither of them intended that it would.

█ With regard to the FH–ICU Contract, however, I reach the opposite conclusion—that both parties intended that the revenue from that contract would be a partnership asset. The FH–ICU Contract was, in fact, originally drafted so that all of the partners at that time—Chadha, Silverman, defendant, and plaintiff—were supposed to be signatories, and that was only changed because Silverman and Chadha

---

3. Defendant originally contended that plaintiff never became a partner because (1) he never passed his Boards; and (2) he was the subject of the Medicare investigation referred to above, *see* fn. 1 *supra* (an investigation that concluded without any charges against plaintiff). Defendant appeared to have abandoned that position by the time of the final pretrial conference. In any event, it is a position that

could not be sustained because (1) plaintiff's employment agreement of May 9, 1997, which provided that he would become a partner after five years, contained no such limitations; and (2) defendant's filing of the Patel Sriraman LLP partnership certificate clearly indicated his understanding that plaintiff was a partner.

left the group. Indeed, even though defendant was the only signatory to the final agreement on the doctors' side, the short-hand reference to him was "the Group," just as it had referred to the partnership in the initial draft. The agreement itself clearly contemplated its performance by more than one physician; it expressly required 24/7 coverage in the ICU, which could only be performed by more than one doctor. Plaintiff, in fact, did render services under that agreement, unlike the Chief of Medicine Contract. The objective indicia of intent thus indicate that both parties regarded it as a partnership asset, and I therefore find that both parties intended the revenue from that contract to be partnership income.

■ The same is true with respect to the Q–LI Contract. The services provided under this contract were directly related to the purpose of the partnership—to provide critical care services in the ICU. As noted above, defendant's intent in allowing plaintiff to retain all of the revenues to that contract was as an advance against his future distributions once patient billings reached a level allowing for such distributions. There is no question that defendant was wholly responsible for the origination of that contract. Defendant did not intend the contract as a "gift" to plaintiff outside of the partnership, which is what it would amount to if I accepted plaintiff's argument that it was his sole property. I therefore find that the parties considered the income from that contract to be within the scope of their partnership agreement.

## V. Termination of the Patel Sriraman Partnership

In May 2008, plaintiff notified defendant that he was going to be moving down south and was leaving the partnership. He ultimately left the partnership on June 30, 2008, and hired an attorney to handle the winding up of the partnership's affairs.

During this process, plaintiff made his first attempts to find out whether defendant had entered into any contracts with Forest Hills Hospital. He retained three different attorneys, all of whom requested copies of any contracts between the partnership and Forest Hills Hospital. Defendant never produced the FH–ICU or Chief of Medicine Contracts to any of plaintiff's attorneys. Plaintiff's current counsel made specific requests for an accounting with respect to the partnership and sought to confirm if defendant had any contracts entered into by PS LLP and/or its partners. Defendant advised his attorney that there were no agreements between Forest Hills Hospital and PS LLP that he signed on behalf of PS LLP.

Plaintiff commenced this action on December 17, 2009. It was not until the parties engaged in discovery that plaintiff was finally able to obtain copies of the final FH–ICU Contract and the Chief of Medicine Contract from Forest Hills Hospital.

## CONCLUSIONS OF LAW

Despite the fact that plaintiff has brought both law and equity claims, this case can be resolved in its entirety by the claim for an accounting. The central issue in this case is the partnership agreement—what were its terms and did it include the 2003 contracts. Moreover, the relief the parties are seeking under all of their claims is identical—they seek to recover the amounts they believe are due pursuant to their partnership arrangement. This is the precise purpose of an accounting claim, and its resolution is dispositive of all of the parties' remaining claims.

## I. The Accounting Claim

■ Under New York law, as well as equity practice in most other common law jurisdictions, an action for an accounting is a two-step process. The first step is to establish the right to an accounting. *See Wood v. Cross Properties, Inc.*, 5 A.D.2d 853, 171 N.Y.S.2d 338 (2d Dep't 1958). This requires the plaintiff initially to establish that he and the defendant had a fiduciary or trust-based relationship concerning the general subject matter of the controversy. *See Village of Hoosick Falls v. Allard*, 249 A.D.2d 876, 879, 672 N.Y.S.2d 447, 449 (3d Dep't 1998).

■ It is axiomatic that partners maintain a fiduciary relationship with regard to the affairs of the partnership. *See Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972–73 (2d Cir.1989). A partner, as a fiduciary, is held to higher standards than those of the marketplace. "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, C.J.). Moreover, "it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746, 747–48, 539 N.E.2d 574 (1989). The broad scope of this rule not only bars self-dealing, but also imposes an affirmative duty on partners to communicate business opportunities to one another. *Id.* When partners engage in self-dealing, they will be held accountable for the secret profit made. *R.C. Gluck & Co. v. Tankel*, 12 A.D.2d 339, 211 N.Y.S.2d 602, 605 (1st Dep't 1961).

■ Once a plaintiff establishes that he has a right to an accounting, the second step is for the Court to "true-up" the partners' individual accounts to make sure that each has been allocated his fair share

of partnership distributions, "fair share" referring to the allocation agreed between the partners or required by law. *See* N.Y. Partnership Law §§ 40 and 71(a)(I). In making this determination, the Court can consider clerical errors in allocations to the individual accounts; breaches of any partnership agreement or of fiduciary duty or fraud committed by one partner against another; diversion or non-contribution of assets that should be within the partnership; or any other matters necessary to restore the individual accounts to the levels established by the partners' agreement or the law. *See Wilde v. Wilde*, 576 F.Supp.2d 595, 607–08 (S.D.N.Y.2008); *Vinlis Constr. Co. v. Roreck*, 30 A.D.2d 668, 668, 291 N.Y.S.2d 924 (2d Dep't 1968). In connection with this second step, the Court can also consider whether an asset which one partner contends is not within the scope of the partnership should in fact be included in the adjustment of the partners' individual accounts. *See* N.Y. Partnership Law § 43(1) ("Every partner must account to the partnership for any benefit, and . . . any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."); *R.C. Gluck & Co.*, 12 A.D.2d at 345, 211 N.Y.S.2d at 608.

■ In the instant case, there can be no dispute that plaintiff, as a partner, became entitled to an accounting upon his withdrawal from the partnership and its dissolution thereupon as a matter of law. *See* N.Y. Partnership Law § 74; *Scholastic, Inc. v. Harris*, 259 F.3d 73, 90 (2d Cir. 2001) ("New York law provides that partners are entitled to an accounting of a partnership following its dissolution."). The first step is therefore satisfied. The remaining issue for this Court is to reconcile the individual partners' accounts to

make sure that each receives the distribution to which he is entitled.

██ A partnership results from an express or implied contract. *Martin v. Peyton*, 246 N.Y. 213, 158 N.E. 77 (1927); N.Y. Partnership Law §§ 10, 11. The rights and obligations of the partners arise from, and are fixed by, their agreement. *Levy v. Leavitt*, 257 N.Y. 461, 178 N.E. 758 (1931). A partnership agreement can be oral, *Missan v. Schoenfeld*, 95 A.D.2d 198, 208, 465 N.Y.S.2d 706, 712 (1st Dep't 1983); however, in the absence of an agreement to the contrary, the rights and duties of partners in relation to the partnership are determined pursuant to New York Partnership Law. Where there is no oral or written partnership agreement, the partnership's profits are split equally and all the partnership property is considered an asset. N.Y. Partnership Law §§ 40 and 71(a)(I) ("[i]n settling accounts between the partners after dissolution ... subject to any agreement to the contrary ... [t]he assets of the partnership" include the "partnership property"). This includes any secret profits a partner earned over the course of the partnership. *See* N.Y. Partnership Law § 43(1); *R.C. Gluck & Co.*, 12 A.D.2d at 345, 211 N.Y.S.2d at 608.

There is surprisingly little New York authority on how a court is to determine what property is within or without a partnership. Perhaps that is because whether one looks to the Uniform Partnership Act (adopted in New York as Partnership Law § 1 *et seq.* (McKinney's 1919)) or the common law, the question of whether a particular asset is partnership property is resolved by the fundamental contractual interpretation exercise of determining the parties' intent. *See The John E. Enright*, 40 F.2d 588, 590 (2d Cir.1930) ("the intent of the partners sets the bounds to which among themselves, at least, the ownership of their own property is transferred to the

partnership"); *In re Amy*, 21 F.2d 301, 303 (2d Cir.1927) ("Whether property owned by a partner and used in the firm business shall be deemed an asset of the firm or of the individual depends upon the intention of the partners."); *Altman v. Altman*, 271 A.D. 884, 67 N.Y.S.2d 119 (2d Dep't 1946) (concluding from written agreement that partners intended specific property to belong to the partnership); *see also Pendleton v. Strange*, 381 S.W.2d 617, 618 (Ky.1964) ("The Uniform Partnership Act ... does not appear to change the common law partnership principles applicable to this case. The intention of the parties evidenced by their conduct governs what constitutes partnership property."); *In re Peyton's Estate*, 143 Cal.App.2d 379, 383, 299 P.2d 897, 899 (1956) (property in the name of one partner "may under some circumstances be treated as partnership property" but requires "a clear showing which discloses such an understanding and intention among the partners"). As one treatise has summarized the law:

> The question whether or not personal property owned or acquired by a partner has been contributed by him or her to the firm so as to become partnership property depends on the intention of the parties as revealed by their conduct; by the provisions of the partnership agreement or agreement preliminary thereto; by the terms of written instruments relative to the transfer of the property to or for use of the firm; by entries in the firm books; and by the use of the property in the firm business, although the mere fact that property is used in the firm business will not of itself show that it is firm property.

68 C.J.S. *Partnership* § 107 (2010).

██ There are limits, of course, to the use of intent in resolving this question. A partner may fully intend to keep an oppor-

tunity to himself, but it is axiomatic that if the opportunity fairly belongs to the partnership, even if he honestly believes it does not, he will have breached his fiduciary duty to his partner by not offering it. *See Meinhard,* 249 N.Y. at 464, 164 N.E. 545 (Cardozo, C.J.). Yet it seems clear that before the Court can find a breach of fiduciary duty for such a usurpation, it needs to know what the parties intended to fall within the scope of their partnership, as opposed to what the parties would be allowed to do for their own account.

In the instant case, the parties have devoted much effort to the issue of whether defendant breached his fiduciary duty and the partnership agreement by not allocating revenues from the Forest Hills contracts, but very little effort to assist me in determining the parties' intent as to these contracts. However, this case depends far more on the intent of the parties with regard to specific assets than on the existence of any breach, as a breach cannot be found if the parties did not agree that revenue from that asset would belong to the partnership.

■ From plaintiff's view, the resolution of this issue is so straightforward it is simply assumed. Since both parties were physicians; they established a medical partnership, and the Forest Hills contracts related to medicine, then it follows *ipso facto,* according to plaintiff, that revenue from those contracts belonged to the partnership.[4] But that is too simplistic a view. Partners can agree to include or exclude revenue from any asset obtained by one of them, either before or after the commencement of their partnership, without limitation. And there is no "default" scenario whereby, if there is no such agreement, any asset relating to medicine becomes a partnership asset simply because the parties never discussed it and it relates to medicine. In other words, there is no more a requirement for defendant to have expressly "reserved" his rights to the Forest Hills contracts than there was such a requirement that plaintiff lay claim to those contracts during the partnership. If there is any "default determination" of this issue, it is that plaintiff has the burden of proving that the parties intended the net revenue from these contracts to be distributed as partnership profits. I cannot find that plaintiff has met that burden.

■ In this regard, the revenues generated from patient billing and the salary that defendant received under the Chief of Medicine Contract come from very different activities. They cannot be lumped together under "the practice of medicine." Patient billing—revenues from treating patients—is the core of any medical practice. The Chief of Medicine Contract, in contrast, is not something shared by most medical practices, but a special opportunity afforded to defendant because of who he was. It is written in the language of a personal employment agreement between Forest Hills Hospital and defendant. It does not involve the practice of medicine at all or the treating of patients, but rather the performance and undertaking of administrative and teaching responsibilities. It allows for no substitution of personnel—

---

4.  More specifically, plaintiff contends that the parties agreed that revenues from the Q–LI Contract would be paid directly to plaintiff, so that the Q–LI Contract is plaintiff's, but they did not discuss the Forest Hills contracts, so those should be shared 50/50. With regard to the Q–LI Contract, however, the parties' discussions never addressed the issue of whether the Q–LI payments to plaintiff would be credited against his partnership distributions. As to the Forest Hills contracts, plaintiff concludes they were partnership assets for the very reason that there were no discussions. But as discussed below, this approach begs the question.

only defendant can perform under that contract.

Plaintiff's argument that this was a partnership opportunity is like arguing that a lawyer, who happens to be an adjunct professor at a law school or author, must contribute his teaching and royalty income to a partnership if he joins his practice with another lawyer (without written or oral agreement). Are the teaching salary and royalty payments included in partnership income? Perhaps or perhaps not. It depends on the parties' mutual intent. Certainly there is no principle of law that automatically requires their inclusion. The question remains as to how the parties intended those revenues to be treated. This intent issue is rendered more difficult where there is an absence of written or even oral discussions, but that is no reason to forcibly expand the partnership to include all income that an individual may earn, simply because he is a partner in a partnership.

When I asked plaintiff at trial why he never followed up to find out about the FH–ICU Contract until after he withdrew from the partnership, he responded essentially that he simply trusted defendant to properly allocate partnership revenues. No doubt he feels the same way about the Chief of Medicine Contract. I find that his answer is credible, but it also indicates that plaintiff was willing to defer to defendant's intent as to what was and was not included as a partnership asset; that, in essence, was the parties' agreement. It is insufficient for plaintiff to rely on his "trust" of defendant as a substitute for forming his own intent instead of acquiring some understanding of the scope of the partnership. He never questioned defendant as to the particulars of his employment as Chief of Medicine; he deferred to defendant in making all management decisions; and never discussed with defendant during the partnership what income should be included as partnership assets.

By so completely deferring to defendant's intent, plaintiff essentially failed to have any expectation or intent of his own until after he left the partnership (perhaps after he spoke to a lawyer). Stated otherwise, the partnership assets would be those which defendant intended would be partnership assets. That was the parties' agreement because plaintiff had no intent to the contrary and was satisfied with that arrangement during his tenure as a partner. Of course, plaintiff's position as a partner did not require him to match defendant in the day-to-day management of the business. It did, however, preclude plaintiff from failing to have any intent as to whether potential sources of income were partnership property, and then forming such an intent only after he had left the partnership.

Based on the evidence adduced at trial, the partnership profits were originally distributed as follows:

| PARTNERSHIP PROFITS | PLAINTIFF | DEFENDANT | TOTAL |
|---|---|---|---|
| 2004 | $ 182,120 | $ 187,198 | $ 369,318 |
| 2005 | $ 183,518 | $ 183,518 | $ 367,036 |
| 2006 | $ 245,380 | $ 142,245 | $ 387,625 |
| 2007 | $ 114,223 | $ 80,158 | $ 194,381 |
| 2008 | $ 112,895 | $ 39,216 | $ 152,111 |
| FH–ICU Contract | —— | $1,500,000 | $1,500,000 |
| Q–LI Contract | $ 849,599 | —— | $ 849,599 |
| **TOTAL:** | $1,687,735 | $2,132,335 | $3,820,070 |

The total distributions of PS LLP from 2003 to 2008 were therefore $3,820,070, in which each partner was entitled to half, or $1,910,035. Plaintiff did not receive his full share of profits, and accordingly defendant must account to plaintiff in the amount of $222,300.

■ Plaintiff's request for punitive damages is denied, as there is no evidence of "intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." *Amusement Industry, Inc. v. Stern,* 693 F.Supp.2d 301, 317 (S.D.N.Y.2010) (citation omitted).[5]

## II. Statute of Limitations

Defendant raises an objection to the Court's reconciliation of the accounts—he contends that plaintiff's claim for an accounting is time-barred. According to defendant, if plaintiff's theory is correct, then defendant breached his fiduciary duty and their oral partnership agreement by not paying him distributions from the 2003 contracts when defendant first started receiving payments under those contracts in 2003. The statute of limitations is six years for a breach of contract, *see* N.Y. C.P.L.R. § 213(2), and either three or six years (depending on the facts and the relief sought, *see Kermanshah v. Kermanshah,* 580 F.Supp.2d 247, 262 (S.D.N.Y. 2008)), for breach of fiduciary duty. Because defendant received some of the payments under those contracts more than six years prior to the commencement of this action on December 17, 2009, defendant asserts that plaintiff's claim for an accounting is untimely. This argument fails for several reasons.

■ Regardless of when defendant first started receiving payments under these contracts, plaintiff's right to an accounting accrued upon dissolution, which occurred by operation of law on June 30, 2008 when he withdrew from the partnership. *See* N.Y. Partnership Law § 60. (when one partner withdraws from a partnership, dissolution occurs absent agreement between the partners to the contrary). As a general rule, upon dissolution of a partnership, any partner is entitled to an accounting. NY Partnership Law § 74. "Upon notice of dissolution and the demand for an accounting, any partner has a right to an immediate accounting as of the date of dissolution." *Scholastic,* 259 F.3d at 90 (citation omitted). "A cause of action for an accounting accrues upon dissolution of the partnership and must be commenced within six years of dissolution." *6D Farm Corp. v. Carr,* 63 A.D.3d 903, 906, 882 N.Y.S.2d 198, 201 (2d Dep't 2009); *see* N.Y. Partnership Law § 74. It is thus clear that plaintiff had six years from June 30, 2008 to commence an accounting proceeding, and his claim here is timely.

Defendant's argument to the contrary stems from a misapprehension of the nature of an action for an accounting. He contended at trial that plaintiff's claim for an accounting is moot because during the course of discovery in this action, he produced all of the partnerships books and records to plaintiff. But the cause of action for an accounting is not to be confused with a partner's right of access to the partnership's books and records. *See Scholastic,* 259 F.3d at 73 ("Even if Scholastic already possesses detailed financial information regarding the joint venture,

---

**5.** As neither party introduced any evidence at trial as to their entitlement to costs and attorneys' fees, and failed to offer a theory as to how pre-judgment interest should be calculated in such a case, their requests for recovery of these elements are denied.

there is nevertheless still 'an absolute right to an accounting.' ") (quoting *Koppel v. Wien, Lane & Malkin,* 125 A.D.2d 230, 234, 509 N.Y.S.2d 327, 330 (1st Dep't 1986) (rejecting defendant's claim that because plaintiffs already had the documents relating to their venture, there was no right to an accounting)). Rather, as noted above, an action for an accounting requires the two step process of determining the existence or absence of a fiduciary relationship, and then, if a fiduciary relationship exists, reconciling the partners' individual accounts based on any partnership agreement or applicable partnership law.

The contrary argument is that since defendant "owed" plaintiff money at the end of 2003 based on the 2003 contracts, plaintiff's causes of action for breach of fiduciary duty and breach of the partnership agreement accrued when defendant first received and retained those moneys. There is some support for this position by virtue of the partnership law provision that a breach of fiduciary duty or of the partnership agreement, if sufficiently severe, can constitute grounds for dissolution, and thus plaintiff arguably could have provoked or initiated a proceeding for dissolution at that time. *See generally* N.Y. Partnership Law § 63(1)(d) (court can order dissolution when a partner "willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him . . ."). However, although I have found that the FH–ICU and Q–LI Contracts were partnership assets, there is no evidence to support a construction of the parties' arrangement that would have required a year end accounting, or indeed an accounting for any particular period, or distributions to be made at any particular time. The parties' arrangement was that defendant authorized distributions whenever he felt he and plaintiff needed distributions. He regularly distributed a higher percentage of patient billings to plaintiff than he did to himself. Had defendant acknowledged in 2003 that the FH–ICU and Q–LI Contracts were partnership assets, there was still nothing that would have required him to distribute proceeds from those contracts at any time in 2003 as opposed, for example, in early 2004 or any other particular time. There was thus no breach of either the partnership agreement or defendant's fiduciary duty that can be tied to 2003.

■ Moreover, even if plaintiff had an accrued claim for breach of fiduciary duty or breach of the partnership agreement at some point in 2003, which in turn would have triggered his right to seek dissolution of the partnership and an accounting, nothing obligated plaintiff to do so at that time. The right to seek dissolution is distinct from the occurrence of dissolution by operation of law that takes place when a partner withdraws from the partnership. The mere fact that a plaintiff-partner might have brought an action at law for breach of contract, or an action at law or in equity for breach of fiduciary duty, at some point prior to the dissolution of the partnership, does not "accelerate" the accrual date for bringing his cause of action for an accounting claim that arose when the partnership went into dissolution. This follows from the well established rule that simply because a plaintiff *could* bring an action at law or some non-accounting claim in equity does not limit his right to proceed instead with an action for an accounting. *Koppel v. Wien, Lane & Malkin,* 125 A.D.2d 230, 509 N.Y.S.2d 327 (1st Dep't 1986) ("[R]egardless of whether or not all of the relevant facts are already known to plaintiffs, it is clear that whenever there is a fiduciary relationship between the parties, as is the situation here, there is an absolute right to an accounting notwithstanding the existence of an adequate remedy at law."); *DiTerlizzi v. DiTerlizzi,*

92 A.D.2d 604, 459 N.Y.S.2d 797 (2d Dep't 1983) ("Although a party may have a legal remedy, he or she is not precluded from seeking equitable relief by way of an accounting predicated upon the existence of a fiduciary relationship."); *cf. Disabled American Veterans v. Phillips*, 13 Misc.3d 1210(A), 824 N.Y.S.2d 753 (N.Y.Sup.Co. 2006) (dismissing claims for breach of fiduciary duty and fraud as untimely, but sustaining claim for accounting covering the same conduct).[6]

■ Only by ignoring plaintiff's right to an accounting upon dissolution could the Court sustain defendant's statute of limitations argument. However, "[a]n action for an accounting examines the entire period of the partnership," *Afloat in France, Inc. v. Bancroft Cruises Ltd.*, No. 03 Civ. 917(SAS), 2003 WL 22400213, *7 (S.D.N.Y. Oct. 21, 2003), to determine what property or profits a fiduciary must return. Thus, plaintiff's claim accrued as of the date of dissolution on June 30, 2008, and is timely.[7]

### CONCLUSION

For the reasons set forth above, the Clerk is directed to enter judgment in favor of plaintiff in the amount of $222,300.00.

**SO ORDERED.**

6. *Phillips* was an action by a corporation against a former officer for diversion of funds. The court dismissed claims for fraud and breach of fiduciary duty for diversions more than three years prior to the commencement of the action, but held that the plaintiff could recover those same sums through its claim for an accounting. In addition, the court held that diversions more than six years prior to the commencement of the action could not be recovered. *Phillips*, however, unlike the instant case, did not involve a cause of action for an accounting that accrued upon dissolution because the parties were not partners. Rather, because the accounting claim could accrue only at the same time as the breach of fiduciary duty and fraud, the plaintiff was limited to recoveries occurring no more than six years prior to commencement.

7. As noted above, since the Court's ruling on the accounting claim resolves all issues between the parties, plaintiff's remaining claims and defendant's counterclaim are dismissed as duplicative.